## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MARC S. KIRSCHNER, as the Trustee of the Refco
Litigation Trust,

        Plaintiff,

v.

CHRISTOPHER SUGRUE and JOHN DOES,
individuals,

        Defendants.

Civil Case No.

_____

## COMPLAINT TO RECOVER FRAUDULENT
## TRANSFERS PURSUANT TO 11 U.S.C. § 550

Marc S. Kirschner (the "Refco Trustee"), as Court-approved Trustee for the Refco

Litigation Trust (the "Trust"),[1] by and through the undersigned counsel, brings this Complaint

against Christopher Sugrue ("Sugrue") and certain John Does (the "John Does," collectively, the

"Defendants") as the immediate or mediate transferees of certain loan proceeds provided by

Refco Capital LLC ("Refco Capital") to Suffolk-SUG LLC ("Suffolk-SUG"), and alleges as

follows:

### I.    PRELIMINARY STATEMENT

1.    Sugrue created Suffolk-SUG in connection with a scheme by which Refco

Capital, an indirect subsidiary of Refco Inc., which filed for bankruptcy on October 17, 2005,

issued a series of loans totaling more than $200 million to finance the purchase by Sugrue and

---

[1]    The Trust is the duly authorized representative to commence all claims and causes of action
formerly owned by the bankruptcy estates of Refco Inc. and certain of its subsidiaries pursuant to
the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect
Subsidiaries, as confirmed by the United States Bankruptcy Court for the Southern District of
New York on December 15, 2006.

Mark Kavanagh of the outstanding equity of PlusFunds Group Inc. ("PlusFunds"), an asset

manager with which Sugrue and Mark Kavanagh were affiliated.  Suffolk-SUG, one of four

entities created for the loan scheme, received a loan on April 13, 2005 from Refco Capital of

$19,400,000 (the "SUG Loan").

2.       In exchange for the SUG Loan, Suffolk-SUG provided Refco Capital a

note and a pledge agreement, whereby Suffolk-SUG's sole member and manager, Sugrue,

pledged all of his equity interest in PlusFunds to Refco Capital.

3.       Upon information and belief, Suffolk-SUG had no intention of repaying

Refco Capital for the SUG Loan and knew full well that the pledge by Sugrue of his equity

interest in PlusFunds was not reasonably equivalent to the SUG Loan because the pledged equity

interest in PlusFunds was not and could not be valued at $19,400,000.

4.       Moreover, at the time of the SUG Loan and all other times relevant hereto,

Refco Capital was insolvent, or became insolvent, and/or had unreasonably small capital in

relation to its business or its transactions at the time or as a result of the SUG Loan.  Thus, the

SUG Loan was, from the outset, an avoidable, constructively fraudulent transfer.

5.       Upon information and belief, after receiving the SUG Loan from Refco

Capital, Sugrue, as the sole member and manager of Suffolk-SUG, caused Suffolk-SUG to make

distributions to Sugrue's personal bank account and/or to third parties, which distributions were

for his benefit.

6.       Further, upon information and belief, Sugrue distributed the funds he

received from Suffolk-SUG to the John Does.

7.       Suffolk-SUG received no value from Sugrue or the John Does for any of

the distributions and, upon information and belief, Sugrue and the John Does acted in bad faith

and with knowledge of the voidability of the transfers as they knew that the distributions violated

the Suffolk-SUG LLC Agreement (as defined below) and that, at the time of the transfers,

Suffolk-SUG was insolvent, or became insolvent, and/or had unreasonably small capital in

relation to its business or its transactions at the time or as a result of the transfers.

8.     All transfers from Suffolk-SUG to Sugrue and/or the John Does are

recoverable by the Refco Trustee pursuant to section 550(a)(2) of title 11 of the United States

Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") as Sugrue and the John

Does are the immediate or mediate transferee of the SUG Loan proceeds *via* the fraudulent

transfer from Refco Capital to Suffolk-SUG.

## II.     NATURE OF ACTION

9.     The Refco Trustee brings this complaint against the Defendants pursuant

to section 550 of the Bankruptcy Code for the recovery of the subsequent transfers made by

Suffolk-SUG to the Defendants as the immediate or mediate transferees of the Refco

Capital/Suffolk-SUG fraudulent transfer.

## III.     BACKGROUND

10.     On October 17, 2005, Refco Capital and certain of its direct and indirect

subsidiaries filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

11.     On March 16, 2007 (the "Petition Date"), the Refco Trustee, as Court-

approved trustee for the Trust, Suffolk-SUG's only known non-contingent, liquidated creditor,

filed against Suffolk-SUG an involuntary petition for relief under chapter 7 of the Bankruptcy

Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware

Bankruptcy Court").

12.     On April 11, 2007, the Delaware Bankruptcy Court entered an Order for

relief in the case captioned In re Suffolk-SUG LLC, Involuntary Chapter 7, Case No. 07-10342.

3

13.    On April 17, 2007, George L. Miller was appointed as chapter 7 trustee of the estate of Suffolk-SUG (the "Suffolk Trustee").

## IV.    JURISDICTION AND VENUE

14.    This Court has jurisdiction over this complaint pursuant to 28 U.S.C. § 1331.

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## V.    PARTIES

16.    The Refco Trustee is the Court-approved Trustee for the Refco Litigation Trust.

17.    Suffolk-SUG, a Delaware corporation, has its registered agent at Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware, 19808. Upon information and belief, because Suffolk-SUG is not an operating business, it has no principal place of business.

18.    Sugrue is the sole member and manager of Suffolk-SUG. Sugrue is a natural person and, upon information and belief, resides at 150 Central Park South, Apt. 2010, New York, NY 10019.

19.    The John Does are persons who Sugrue distributed the Suffolk-SUG transfers subsequent to his receipt. Thus, the John Does are the immediate or mediate transferees of the SUG Loan proceeds *via* the fraudulent transfer from Refco Capital to Suffolk-SUG.

## VI.    FACTUAL BACKGROUND

**A.    Formation of Suffolk-SUG and Suffolk-SUG's Limited Liability Company Agreement**

20.    On March 11, 2005, Suffolk-SUG, along with three other special purpose

4

entities (collectively, with Suffolk-SUG, the "Suffolk Entities"),[2] were formed in contemplation of a series of transactions (collectively, the "Suffolk Loan Transaction"), whereby the Suffolk Entities would receive certain loans from Refco Capital.

21. In connection therewith, on March 25, 2005, Sugrue, as Suffolk-SUG's sole member and manager, entered into the limited liability company agreement of Suffolk-SUG (the "Suffolk-SUG LLC Agreement").

22. The Suffolk-SUG LLC Agreement allowed for distributions Sugrue, but only after payment of all obligations to third parties:

> (a)    After payment of all obligations of [Suffolk-SUG] to third parties, [Suffolk-SUG] shall distribute Available Cash (as defined below) to the Member at such times and in such amounts as determined by the Member, in accordance with the Member's Percentage Interest.

> (b)    "Available Cash", as of any date, shall mean the excess of cash received by [Suffolk-SUG] from its operations and investments during the applicable period over total current operating expenses and reasonable reserve for future expenses determined by the Member in its sole and absolute direction, including payment in respect of indebtedness of [Suffolk-SUG]

(Suffolk-SUG LLC Agreement ¶ 13(a), (b), a true and correct copy of which is attached hereto and incorporated herein as Exhibit "A.")

## B.    Refco Capital's Loan to Suffolk-SUG

23. On March 29, 2005, Refco Capital and the Suffolk Entities entered into the Suffolk Loan Transaction, pursuant to which Refco Capital loaned or committed to loan over $200 million to the Suffolk Entities to fund the Suffolk Entities' acquisition of PlusFunds' equity interests.

---

[2]    The other Suffolk Entities are Suffolk LLC, Suffolk-KAV LLC and Suffolk-MKK LLC. The Suffolk Trustee has been appointed to serve as chapter 7 trustee for the estates of each of the Suffolk Entities.

24.     As part of the Suffolk Loan Transaction, Refco Capital entered into a Credit Agreement with Suffolk-SUG dated as of March 29, 2005 (the "SUG Credit Agreement"; a true and correct copy of which is attached hereto and incorporated herein as Exhibit "B"), pursuant to which Refco Capital loaned $19,400,000 to Suffolk-SUG, evidenced by a Promissory Note dated April 13, 2005 from Suffolk-SUG to Refco Capital.

25.     The SUG Credit Agreement obligated Suffolk SUG to repay the SUG Loan with agreed upon interest: "[t]he Loan shall accrue interest at a rate per annum equal to the LIBO Rate plus the Applicable Margin." (SUG Credit Agreement § 3.3 (Ex. B).)

26.     In exchange for the SUG Loan, Suffolk-SUG's sole member and manager, Sugrue, pledged all of his equity interest in PlusFunds to Refco Capital (the "Sugrue Pledge Agreement"). (See SUG Credit Agreement at 1 ("WHEREAS, the Borrower's sole member . . . desires to secure all of the Obligations by pledging to the Lender all of the Capital Securities of PlusFunds held or hereafter acquired by it") (Ex. B).)

27.     Upon information and belief, Suffolk-SUG had no intent of repaying the SUG Loan and knew that the Sugrue Pledge Agreement did not provide Refco Capital with reasonably equivalent value for the SUG Loan because the pledged equity interest in PlusFunds was not and could not be valued at $19,400,000.

28.     Furthermore, at the time of the SUG Loan, Refco Capital was insolvent, became insolvent, and/or had unreasonably small capital in relation to its business or transactions at the time or as a result of the SUG Loan.

**C.     Distribution of the SUG Loan Proceeds to the Defendants**

29.     Upon information and belief, subsequent to Refco Capital's transfer of the SUG Loan to Suffolk-SUG, Sugrue caused Suffolk-SUG to distribute the SUG Loan proceeds to Sugrue's personal bank account and/or to third parties, which distributions were for his benefit.

6

30.    Further, upon information and belief, Sugrue caused the funds he received to be distributed to the John Does (the transfers to Sugrue and the John Does is collectively referred to as the "Subsequent Transfers").

31.    On information and belief, neither Sugrue nor the John Does provided Suffolk-SUG any value for the Subsequent Transfers.

32.    Moreover, upon information and belief, Sugrue and the John Does acted in bad faith and with knowledge of the voidability of the transfers as they knew that the distributions violated the Suffolk-SUG LLC Agreement and that, at the time of the transfers, Suffolk-SUG was insolvent, or became insolvent, and/or had unreasonably small capital in relation to its business or its transactions at the time or as a result of the Subsequent Transfers.

33.    As such, Sugrue and the John Does, as the recipients of the Subsequent Transfers, were the immediate or mediate transferees of the SUG Loan proceeds and did not take for value, in good faith, and without knowledge of the voidability of the transfers.

## COUNT I
### RECOVERY OF THE SUBSEQUENT TRANSFERS
### PURSUANT TO SECTION 550(a)(2) OF THE BANKRUPTCY CODE

34.    The Refco Trustee repeats and realleges the preceding paragraphs as if set forth fully herein.

35.    The SUG Loan from Refco Capital to Suffolk-SUG constituted an avoidable, constructively fraudulent transfer pursuant to section 548(a)(1)(B) of the Bankruptcy Code as: (i) Refco Capital received less than reasonably equivalent value from Suffolk-SUG in exchange for the SUG Loan; and (ii) at the time of the SUG Loan, Refco Capital was insolvent, or became insolvent, and/or had unreasonably small capital in relation to its business or its transactions at the time or as a result of the SUG Loan.

7

36.    Upon information and belief, subsequent to making the SUG Loan, Suffolk-SUG, at the direction of its sole member and manager, Sugrue, caused Suffolk-SUG to make the Subsequent Transfers to Sugrue's personal bank account and/or to third parties, which distributions were for his benefit.

37.    Moreover, upon information and belief, Sugrue caused the funds he received to be distributed to the John Does.

38.    Neither Sugrue nor the John Does provided any value to Suffolk-SUG for the Subsequent Transfers.

39.    On information and belief, at the time of making the Subsequent Transfers, Sugrue and the John Does acted in bad faith and with knowledge of the voidability of the transfers as they knew that the distributions violated the Suffolk-SUG LLC Agreement and that, at the time of the transfers, Suffolk-SUG was insolvent, or became insolvent, and/or had unreasonably small capital in relation to its business or its transactions at the time or as a result of the Subsequent Transfers.

40.    As such, Sugrue and the John Does were the immediate or mediate transferees of the SUG Loan proceeds, and did not take for value, in good faith, and without knowledge of the voidability of the transfers.

41.    Accordingly, Refco Capital's transfer to Suffolk-SUG of the SUG Loan constituted an avoidable, constructively fraudulent transfer and Sugrue and the John Does are the immediate or mediate transferees of the SUG Loan proceeds.  Pursuant to section 550(a)(2) of the Bankruptcy Code, the Refco Trustee may recover said subsequent transfers from Sugrue and the John Does as the immediate or mediate transferees.

8

## REQUEST FOR RELIEF

**WHEREFORE**, the Refco Trustee requests that the Court enter judgment:

    (i)      requiring Sugrue and the John Does to repay all the Subsequent Transfers pursuant to section 550(a)(2) of the Bankruptcy Code;

    (ii)     decreeing that Sugrue and the John Does shall pay to the Refco Trustee the full amount of the Subsequent Transfers received, with lawful pre- and post-judgment interest and costs of this action, including costs and reasonable attorneys' fees incurred in connection with the investigation and prosecution of the instant action;

    (iii)    requiring Sugrue and the John Does to pay to the Refco Trustee all reasonable attorney's fees and costs incurred by the Refco Trustee in this action, including expert-witness fees; and

**[REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK]**

(iv)    granting such other and further relief, at law or in equity, that the Court

may deem just.

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

By: _____

Gregory W. Werkheiser (No. 3553)
Thomas F. Driscoll III (No. 4703)
Chase Manhattan Centre, 18th Floor
1201 Market Street
P.O. Box 1347
Wilmington, Delaware, 19899-1347
Telephone:    (302) 658-9200
Facsimile:    (302) 658-3989
E-mail: gwerkheiser@mnat.com
         tdriscoll@mnat.com

**Counsel for Marc S. Kirschner, the Trustee for the
Refco Litigation Trust**

*Of Counsel:*

**MILBANK, TWEED, HADLEY & M^cCLOY LLP**
Scott Edelman (*pro hac vice forthcoming*)
Andrew M. Leblanc (*pro hac vice forthcoming*)
One Chase Manhattan Plaza
New York, New York  10005
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

**Counsel for Marc S. Kirschner, the Trustee for the
Refco Litigation Trust**

October 16, 2007

DC1:#8140027v3

# EXHIBIT A

EXECUTION COPY

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## SUFFOLK-SUG LLC

This Limited Liability Company Agreement (this "Agreement") of Suffolk-SUG LLC (the "Company"), dated as of March 15, 2005, is entered into by Christopher Sigrus, as the sole member (the "Member").

### RECITALS

WHEREAS, the Company was formed as a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del.C. §18-101, et. seq.), as amended from time to time (the "Act"), by the filing of a Certificate of Formation (and any amendments and/or restatements thereof) (the "Certificate of Formation") with the Secretary of State of the State of Delaware on March 11, 2005;

NOW, THEREFORE, the Member, by execution of this Agreement, hereby adopts the following as its limited liability company agreement pursuant to and in accordance with the Act, and hereby agrees as follows:

1.    Name and Formation. The name of the limited liability company formed pursuant to the Certificate of Formation is Suffolk-SUG LLC. John David Merimee (the "Authorized Person"), as an authorized person within the meaning of the Act, executed, delivered and filed the Certificate of Formation. The Company hereby adopts and ratifies the Certificate of Formation and all acts taken by the Authorized Person in connection therewith.

2.    Purposes. The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in any lawful act or activity for which limited liability companies may be formed under the Act.

3.    Term. The Term of the Company commenced on the date of filing of the Certificate of Formation and shall continue until terminated pursuant to the provisions of the Act and this Agreement. The existence of the Company as a separate legal entity will continue until the cancellation of the Certificate of Formation as provided in the Act.

4.    Powers. In furtherance of its purposes, but subject to all of the provisions of this Agreement, the Company shall have and may exercise all the powers now or hereafter conferred by Delaware law on limited liability companies formed under the Act and all powers necessary, convenient or incidental to accomplish its purposes as set forth in Section 2.

5.    Principal Business Office. The principal business office of the Company shall be at such location as the Member may, from time to time, select.

80323153_2.DOC

6.    Registered Office.  The address of the registered office of the Company in the State of Delaware is c/o Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808, County of New Castle.

7.    Registered Agent.  The name and address of the registered agent of the Company for service of process in the State of Delaware is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808, County of New Castle.

8.    Member.  The name, mailing address and capital contribution of the Member are set forth in Schedule I hereto, as such schedule may be amended from time to time.

9.    Limited Liability and Ownership of Company Property.  Except as required by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member of the Company.  All property owned by the Company, whether real or personal, tangible or intangible, and wherever located, shall be deemed to be owned by the Company as an entity, and the Member shall not have any ownership interest in such property.

10.    Percentage Interests.

(a)    For all purposes of this Agreement, the term "Percentage Interest", as applied to a particular member or members shall mean such member's or members' personal property ownership right in the Company, subject to adjustments pursuant to Section 24 below, expressed as a percentage, which shall entitle such member or members to share in the profits and losses of the Company and to share in distributions made by the Company in accordance with this Agreement.

(b)    The Percentage Interest of the Member shall be as set forth in Schedule I hereto.  Each member shall vote in proportion to such member's Percentage Interest.

11.    Capital Contributions.  The Member is deemed admitted as a member of the Company upon its execution and delivery of this Agreement.  The Member has made a capital contribution to the Company in the amount set forth on Schedule I hereto, and no other cash or property, to the Company.

12.    Additional Contributions.  The Member is not required to make any additional capital contributions to the Company.  However, the Member may voluntarily make additional capital contributions to the Company at any time.  To the extent that the Member makes an additional capital contribution to the Company, Schedule I hereto shall be revised to reflect such additional capital contribution.

13.    Distributions.

(a)    After payment of all obligations of the Company to third parties, the Company shall distribute Available Cash (as defined below) to the Member at such times and in

2

such amounts as determined by the Member, in accordance with the Member's Percentage Interest.

(b)    "Available Cash", as of any date, shall mean the excess of cash received by the Company from its operations and investments during the applicable period over total current operating expenses and reasonable reserves for future expenses as determined by the Member in its sole and absolute discretion, including payment in respect of indebtedness of the Company, capital improvements and contingencies; provided, that, Available Cash shall not be reduced by noncash charges including, without limitation, depreciation and amortization.

(c)    Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make a distribution to the Member on account of its Percentage Interest in the Company if such distribution would violate the Act or any other applicable law.

14.    Management.  In accordance with Section 18-402 of the Act, management of the Company shall be vested in the Member. Except as otherwise expressly provided in this Agreement, the Member shall have complete and exclusive discretion in the management and control of the affairs and business of the Company and shall have all powers necessary, convenient or appropriate to carry out the purposes, conduct the business, and exercise the powers of the Company. The Member shall possess and enjoy with respect to the Company all of the rights and powers of a manager of a limited liability company under the Act, and the Member shall conduct the business of the Company in accordance with this Agreement and the Act. Notwithstanding any other provision of this Agreement, the Member is authorized to execute and deliver any document on behalf of the Company without any vote or consent of any other person. The Member has the authority to bind the Company.

15.    Other Businesses.  The Member and any person or entity affiliated with the Member may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others, including, without limitation, businesses that may compete with the Company. The Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

16.    Exculpation and Indemnification.

(a)    The Member shall not be liable to the Company or any other person or entity who has an interest in or claim against the Company for any loss, damage or claim incurred by reason of any act or omission performed or omitted by the Member in good faith pursuant to the authority granted by this Agreement, except that the Member shall be liable for any such loss, damage or claim incurred by reason of the Member's gross negligence or willful misconduct.

(b)    The Company shall save, indemnify, defend and hold harmless the Member to the fullest extent permitted by the Act, including without limitation, from and against any and all claims or liabilities of any nature whatsoever, including, but not limited to, reasonable attorneys' fees and expenses, arising out of or in connection with any action taken or

3

omitted by the Member pursuant to the authority granted by this Agreement, except where attributable to the gross negligence or willful misconduct of the Member. The Member shall be entitled to rely on the advice of counsel, public accountants or other independent experts experienced in the matter at issue, and any act or omission of the Member in reliance on such advice shall in no event subject the Member to liability to the Company or any other person.

17.     Books of Account.  The Company shall maintain proper books and records and shall determine all items of profits and losses and distributions on an accrual basis in accordance with this Agreement and in accordance with U.S. generally accepted accounting principles consistently applied or other good accounting principles consistently applied.  The Company also shall keep all other records necessary or convenient to record the Company's business and affairs and sufficient to record the determination and allocation of all profits, losses, distributions and other amounts as may be provided herein.

18.     Reports.  The books and records of the Company shall be closed, and may be, but shall not be required to be, audited and certified, as of the end of each fiscal year by reputable independent public accountants selected by the Member.  As soon as practicable after the end of each fiscal year, there shall be prepared and delivered to the Member a financial statement for the Company consisting of the following: (i) income statements and balance sheets for such fiscal year showing separately the computation of profits and losses, (ii) the amount of the distributions to the Member and the effect of such distributions on the balance sheet of the Company, and (iii) a report setting forth in sufficient detail all such information and data with respect to the business transactions effected by or involving the Company during such fiscal year as shall enable the Member to prepare all of its tax returns in accordance with all relevant laws, rules and regulations then prevailing.

19.     Access to Books.  The books and records of the Company shall be available to the Member or its representatives for inspection and audit upon reasonable notice during normal business hours at the principal business office of the Company.  The Company shall cause its accountants or auditors to cooperate in such inspection and audit and provide any of their work papers requested in connection therewith.

20.     Tax Treatment of Company.  The Company shall be disregarded as an entity separate from the Member for purposes of United States federal, state, and local income taxation.

21.     Fiscal Year.  The fiscal year of the Company shall end on the 31st day of December of each year.

22.     Transfers/Assignments.  The Member may at any time assign or transfer in whole or in part its limited liability company interest in the Company.  If the Member transfers all of its interest in the Company pursuant to this Section, the transferee shall be admitted to the Company only upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement.  Such admission shall be deemed effective immediately prior to the transfer, and, immediately following such admission, the transferor Member shall cease to be a member of the Company.

23.    Resignation. The Member may at any time resign from the Company. If the Member resigns pursuant to this Section, an additional member shall be admitted to the Company upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement. Such admission shall be deemed effective immediately prior to the resignation, and, immediately following such admission, the resigning Member shall cease to be a member of the Company.

24.    Additional Members.

(a)    No person shall have any rights as a member of the Company unless and until such person is admitted as a member after receipt of approval as is required by, and compliance with, the following:

(i)    A new member may be admitted to the Company only with the consent of the Member; and

(ii)    A person may be admitted as a new member only if such person shall have executed a counterpart of this Agreement or an appropriate supplement to it, in which such person makes such representations and warranties as the Member deems appropriate and agrees to be bound by the terms and provisions of this Agreement as they may be modified by that supplement. Any person so admitted shall have all the rights and obligations of a member hereunder effective on and after the date of admission as a member of the Company.

(b)    One or more additional members may be admitted to the Company without the transfer by an existing member of all or any part of its Percentage Interest by the issuance of additional Percentage Interests with the consent of the Member and compliance with Section 24(a) above, and upon such terms as are established by the Member for such new Percentage Interests. Upon the issuance of additional Percentage Interests in accordance with this Section 24(b), the Percentage Interests of the members admitted prior to such issuance shall be adjusted by the Member to reflect the issuance of additional Percentage Interests as set forth above such that the sum of the Percentage Interests of all members equals 100%.

25.    Dissolution. The Company shall dissolve and its affairs shall be wound up upon the first to occur of: (i) the written consent of the Member, (ii) any time there are no members of the Company, unless the Company is continued in accordance with the Act, or (iii) the entry of a decree of judicial dissolution under Section 18-802 of the Act. On dissolution of the Company, the Member shall appoint one or more persons as liquidators of the Company. The liquidators shall forthwith commence the winding up of the Company's business and the liquidation of its property. The liquidators shall have full power and authority, subject to the provisions of this Section 25, to sell, assign and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and businesslike manner. All proceeds from the sale or disposition of the property of the Company shall, to the maximum extent permitted by law, be applied as follows:

(a)    First, in payment to creditors, including the Member, if it is a creditor, to the extent otherwise permitted by law, in satisfaction of liabilities (including contingent or

5

unmatured liabilities) of the Company (whether by payment or the making of reasonable provision for payment thereof) other than liabilities for distributions owing to the Member; and

(b)    Second, to the Member in proportion to its unreturned capital contributions until the capital contributions of the Member have been returned, treating each distribution made pursuant to Section 13 hereof as having been made first from profits to the extent thereof and last from capital contributions; and

(c)    Third, to the Member in proportion to its Percentage Interest in the Company.

The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidator(s) shall continue to operate the Company properties with all the power and authority of the Member hereunder and shall be entitled to the benefits of limitation of liability and indemnification provided to the Member in this Agreement. The liquidator(s) may make distributions of the Company's assets in kind. The choice of which, if any, Company assets are to be distributed in kind shall be within the sole discretion of the liquidator(s) and shall be binding upon the Member. In kind distributions shall be made to the maximum extent practicable, unless the Member otherwise agrees, to the Member in accordance with its Percentage Interest with the value of such assets being determined by the liquidator(s) in good faith.

26.    Liquidation Statement. The Member shall be furnished with a statement prepared by the liquidator(s), which shall set forth the assets and liabilities of the Company as of the date of complete liquidation.

27.    Cancellation of Filings. Upon completion of the distribution of Company assets as provided in Section 25 hereof, the Member, as an authorized person within the meaning of the Act, shall file a Certificate of Cancellation with the Secretary of State of the State of Delaware, whereupon the Company shall be terminated; and shall take such other actions as may be necessary to terminate the Company.

28.    Notices. Except as otherwise expressly provided in this Agreement, any notice or demand required or permitted to be given or made to or upon the Member pursuant to any of the provisions of this Agreement shall be deemed to have been duly given or made for all purposes if (i) in writing and delivered by overnight courier or by hand against receipt, or sent by certified or registered mail, postage prepaid, return receipt requested, or (ii) sent by telegram, telecopy, telex or other electronic means and followed by a copy delivered or sent in the manner provided in clause (i) above, to the Member at its address as set forth on Schedule I hereto, or at the most recent address, specified by written notice, given to the sender by addressee under this provision. Notices to the Company shall be given in the same manner and shall be addressed to it at its principal business office.

29.    Benefits of Agreement; No Third-Party Rights. The provisions of this Agreement are intended solely to benefit the Member and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any creditor of the Company (and no such creditor shall be a third-party beneficiary of this Agreement), and the Member shall have no duty

or obligation to any creditor of the Company to make any contributions or payments to the Company.

30.    Severability of Provisions.  Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

31.    Entire Agreement.  This Agreement constitutes the entire agreement of the Member with respect to the subject matter hereof.

32.    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of Delaware.

33.    Amendments.  This Agreement may not be modified, altered, supplemented or amended except pursuant to a written agreement executed and delivered by the Member.

[The remainder of this page is intentionally left blank.]

7

IN WITNESS WHEREOF, the undersigned, being the sole member of the Company, intending to be legally bound hereby, has duly executed this Agreement as of the date first written above.

CHRISTOPHER SUGRUE

## SCHEDULE I

| Name of Member | Mailing Address | Capital Contribution | Percentage Interest |
|---|---|---|---|
| Christopher Sugrue | 150 Central Park South, Apt. 2010 New York, NY 10019 | $100 | 100% |

# Delaware

PAGE 1

### The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF FORMATION OF "SUFFOLK-SUG LLC", FILED
IN THIS OFFICE ON THE ELEVENTH DAY OF MARCH, A.D. 2005, AT 12:39
O'CLOCK P.M.



Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 3737485

DATE: 03-11-05

3932374  8100

050206337

# CERTIFICATE OF FORMATION

## OF

## SUFFOLK-SUG LLC

This Certificate of Formation of Suffolk-SUG LLC, dated as of March 11, 2005, is being duly executed and filed by John David Merimee, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del C. § 18-101, et. seq.).

FIRST. The name of the limited liability company formed hereby is Suffolk-SUG LLC (the "Company").

SECOND. The address of the registered office of the Company in the State of Delaware is c/o Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DB 19808, County of New Castle.

THIRD. The name and address of the registered agent of the Company for service of process in the State of Delaware is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DB 19808, County of New Castle.

IN WITNESS HEREOF, the undersigned has executed and filed this Certificate of Formation as of the date first above written.

By: _____
Name: John David Merimee
Title: Authorized Person

State of Delaware
Secretary of State
Division of Corporations
Delivered 01:04 PM 03/11/2005
FILED 12:39 PM 03/11/2005
SRV 050206337 - 3932374 FILE

10319894_1.DOC

# EXHIBIT B

PHASE 2 CREDIT AGREEMENT,

dated as of March 29, 2005,

between

SUFFOLK-SUG LLC,

as the Borrower,

and

REFCO CAPITAL LLC,

as the Lender

# TABLE OF CONTENTS

Page

ARTICLE I     DEFINITIONS AND ACCOUNTING TERMS .............................................. 1
    SECTION 1.1.     Defined Terms .................................................................. 1
    SECTION 1.2.     Use of Defined Terms .................................................... 11
    SECTION 1.3.     Cross-References ............................................................ 11
    SECTION 1.4.     Accounting and Financial Determinations.......................... 11
ARTICLE II     COMMITMENTS, BORROWING PROCEDURES AND NOTES ............ 11
    SECTION 2.1.     Commitments..................................................................... 11
    SECTION 2.2.     Register; Notes................................................................. 11
    SECTION 2.3.     Borrowing Procedures .................................................... 12
ARTICLE III     REPAYMENTS, PREPAYMENTS AND INTEREST ........................ 12
    SECTION 3.1.     Repayments and Prepayments ........................................ 12
    SECTION 3.2.     Interest Provisions............................................................ 12
    SECTION 3.3.     Interest Rates.................................................................... 12
    SECTION 3.4.     Post-Maturity Rates ......................................................... 13
    SECTION 3.5.     Interest Payment Dates .................................................... 13
ARTICLE IV     CERTAIN TAX AND OTHER PROVISIONS ................................. 13
    SECTION 4.1.     Taxes ................................................................................ 13
    SECTION 4.2.     Payments, Computations, etc........................................... 15
    SECTION 4.3.     Setoff................................................................................ 15
ARTICLE V     CONDITIONS ..................................................................... 15
    SECTION 5.1.     Conditions to Loan............................................................ 15
ARTICLE VI     REPRESENTATIONS AND WARRANTIES.................................. 17
    SECTION 6.1.     Organization, etc............................................................... 17
    SECTION 6.2.     Due Authorization, Non-Contravention, etc..................... 18
    SECTION 6.3.     Government Approval, Regulation, etc ............................. 18
    SECTION 6.4.     Validity, etc....................................................................... 18
    SECTION 6.5.     Financial Information......................................................... 18
    SECTION 6.6.     No Material Adverse Change; Solvency............................ 18
    SECTION 6.7.     Litigation, Labor Controversies, etc ................................ 18
    SECTION 6.8.     Subsidiaries ...................................................................... 19
    SECTION 6.9.     Ownership of Properties ................................................... 19

**TABLE OF CONTENTS**
(continued)

Page

SECTION 6.10.     Taxes ...................................................................... 19

SECTION 6.11.     Pension Plans ......................................................... 19

SECTION 6.12.     Regulations U and X .............................................. 19

SECTION 6.13.     Capitalization of PlusFunds .................................. 19

SECTION 6.14.     Capitalization of Borrower ................................... 20

SECTION 6.15.     Board Representation of PlusFunds ..................... 20

ARTICLE VII     COVENANTS ............................................................ 20

SECTION 7.1.     Affirmative Covenants ............................................. 20

SECTION 7.2.     Negative Covenants .................................................. 22

ARTICLE VIII     EVENTS OF DEFAULT ............................................ 23

SECTION 8.1.     Listing of Events of Default .................................... 23

SECTION 8.2.     Action if Bankruptcy ................................................ 26

ARTICLE IX     MISCELLANEOUS PROVISIONS ............................. 26

SECTION 9.1.     Waivers, Amendments, etc ....................................... 26

SECTION 9.2.     No Deemed Waiver .................................................... 26

SECTION 9.3.     Notices; Time ............................................................. 26

SECTION 9.4.     Payment of Costs and Expenses ............................. 27

SECTION 9.5.     Indemnification .......................................................... 27

SECTION 9.6.     Confidentiality ........................................................... 27

SECTION 9.7.     Survival ....................................................................... 28

SECTION 9.8.     Severability ................................................................. 29

SECTION 9.9.     Headings ...................................................................... 29

SECTION 9.10.     Execution in Counterparts, Effectiveness, etc .......... 29

SECTION 9.11.     Governing Law; Entire Agreement .......................... 29

SECTION 9.12.     Successors and Assigns ............................................ 29

SECTION 9.13.     Fiduciary Duties ........................................................ 30

SECTION 9.14.     Other Transactions .................................................... 30

SECTION 9.15.     Forum Selection and Consent to Jurisdiction ........... 30

SECTION 9.16.     Waiver of Jury Trial .................................................. 30

SCHEDULE I     -     Disclosure Schedule to Credit Agreement

EXHIBIT A     -     Form of Note

EXHIBIT B     -     Form of Borrowing Request

EXHIBIT C     -     Form of Borrower Closing Date Certificate

EXHIBIT D     -     Form of Pledge Agreement

EXHIBIT E     -     Form of Opinion

EXHIBIT F     -     Form of PlusFunds Credit Agreement

EXHIBIT G     -     Form of Contribution Agreement

EXHIBIT H     -     Form of Amendment No. 1 to Stockholders Agreement

SCHEDULE 1          Disclosure Schedule  to Credit Agreement

ITEM 6.6            Material Adverse Change

ITEM 6.13           Capitalization of PlusFunds; Capital Securities of PlusFunds owned by the Pledging Member

ITEM 8.13           Stock Issuable on Conversion

CREDIT AGREEMENT

THIS CREDIT AGREEMENT, dated as of March 29, 2005, is between Suffolk-SUG LLC, a Delaware limited liability company (the "Borrower"), and Refco Capital LLC, a Delaware limited liability company (including any successors and assigns permitted under Section 9.12 hereof) (the "Lender").

W I T N E S S E T H:

WHEREAS, the Borrower has requested that the Lender extend credit in an aggregate amount (the "Commitment Amount") not to exceed $19,400,000; and

WHEREAS, the Borrower's sole member (the "Pledging Member") desires to secure all of the Obligations by pledging to the Lender all of the Capital Securities of PlusFunds held or hereafter acquired by it; and

WHEREAS, the Lender is willing, on the terms and subject to the conditions hereinafter set forth, to extend the Commitment and make the Loan to the Borrower;

NOW, THEREFORE, the parties hereto agree as follows.

ARTICLE I
DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.1.  Defined Terms.  The following terms (whether or not underscored) when used in this Agreement, including its preamble and recitals, shall, except where the context otherwise requires, have the following meanings (such meanings to be equally applicable to the singular and plural forms thereof):

"Affiliate" of any Person means any other Person which, directly or indirectly, controls, is controlled by or is under common control with such Person. "Control" (including "controlling", "controlled by", and "under common control with") of a Person means the power, directly or indirectly,

(a)  to vote 10% or more of the Capital Securities (on a fully diluted basis) of such Person having ordinary voting power for the election of directors, managing members or general partners (as applicable); or

(b)  to direct or cause the direction of the management and policies of such Person (whether by contract or otherwise);

provided that none of the SPhinX Funds shall be deemed to be an Affiliate of the Borrower for any purpose hereunder.

9029181.5  29-Mar-05 10:03  04374457

"Agreement" means, on any date, this Credit Agreement as originally in effect on the Effective Date and as thereafter from time to time amended, supplemented, amended and restated or otherwise modified from time to time and in effect on such date.

"Applicable Margin" means 2.25%.

"Assets Under Management" means the total market value of all assets for which PlusFunds receives a management or administrative fee on the date of determination.

"Authorized Officers" means relative to the Borrower, those of its officers, general partners or managing members (as applicable) whose signatures and incumbency shall have been certified to the Lender.

"Board of Directors" means, with respect to any Person, the board of directors (or any similar governing body) of such Person or, unless the context otherwise requires, any authorized committee of the board of directors (or such body) of such Person.

"Borrower" is defined in the preamble.

"Borrower Closing Date Certificate" means the closing date certificate executed and delivered by an Authorized Officer of the Borrower, substantially in the form of Exhibit C hereto.

"Borrowing Request" means a request duly executed by an Authorized Officer of the Borrower, substantially in the form of Exhibit B hereto.

"Business Day" means any day which is neither a Saturday or Sunday nor a legal holiday on which banks are authorized or required to be closed in New York, New York.

"Call Right" means Lender's right and option under the Pledge Agreement to purchase Capital Securities of PlusFunds.

"Capitalized Lease Liabilities" means all monetary obligations of a Person under any leasing or similar arrangement which, in accordance with GAAP, would be classified as capital lease.

"Capital Securities" means, with respect to any Person, any and all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of such Person's capital, whether now outstanding or issued after the Effective Date.

"Change in Control" means the failure of the Pledging Member to own 100% of the membership interests of the Borrower.

"Closing Date" means such date on which all conditions for the Loan set forth in Section 5.1 have been satisfied or waived, but in no event shall such date for the Loan be later than the Commitment Termination Date.

"Code" means the Internal Revenue Code of 1986, and the regulations thereunder, in each case as amended, reformed or otherwise modified from time to time.

"Collateral" means all Capital Securities of PlusFunds directly or indirectly held by the Pledging Member or hereafter acquired and pledged to the Lender under the Pledge Agreement.

"Commitment" means the Lender's obligation to make the Loan pursuant to Section 2.1.

"Commitment Amount" is defined in the first recital.

"Commitment Termination Date" means the earlier of

    (a)  October 31, 2005 (if the Loan has not been made on or prior to such date); and

    (b)  the date on which any Commitment Termination Event occurs.

Upon the earlier of the occurrence of the dates described above, the Commitment shall terminate automatically and without any further action.

"Commitment Termination Event" means

    (a)  the occurrence of any Event of Default with respect to the Borrower described in clauses (a) through (d) of Section 8.1.9 with respect to the Borrower; or

    (b)  the occurrence and continuance of any other Event of Default and the giving of notice by the Lender to the Borrower that the Commitment has been terminated.

"Confidential Information" means, without limitation, this Agreement and the transactions contemplated by this Agreement, including the terms and conditions hereof and thereof, all financial, business, operating and other data, including processes, reports, interpretations, forecasts, records and other informational material in written or other fixed form, provided by the Borrower or any of its Affiliates or their respective representatives concerning the Borrower or any of its Affiliates or the SPhinX Funds and all notes, analyses, compilations, studies, interpretations and other documents prepared by the Borrower or any of its Affiliates or their respective representatives that contain, reflect or are based upon, in whole or in part, such information, provided, that, "Confidential Information" shall not include information that (i) is or becomes generally available to the public or is generally known in the industry other than as a result of a disclosure by the Lender or any of its representatives, (ii) was in the Lender's possession prior to its being furnished to the Lender by the Borrower or any Affiliate or any of their respective representatives, (iii) became available to the Lender on a non-confidential basis from a source other than the Borrower or any of its Affiliates or any of their respective representatives, or (iv) was received by the Lender from the Borrower or any Affiliate pursuant to existing or future commercial relationships entered into in the ordinary course of business; provided further, that, in the case of (ii), (iii) and (iv) above, the source of the information was known by the Lender to be bound by a confidentiality agreement with, or other contractual, legal or fiduciary obligation of confidentiality to, the Borrower or any of its Affiliates or any SPhinX Fund or any other person with respect to the information, and provided further that in the case of

-3-

(iv) above, any such information shall remain subject to any separate confidentiality agreement that might be applicable.

"Contingent Liability" means any agreement, undertaking or arrangement by which any Person guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to, or otherwise to invest in, a debtor, or otherwise to assure a creditor against loss) the Indebtedness of any other Person (other than by endorsements of instruments in the course of collection), or guarantees the payment of dividends or other distributions upon the Capital Securities of any other Person. The amount of any Person's obligation under any Contingent Liability shall (subject to any limitation set forth therein) be deemed to be the outstanding principal amount of the debt, obligation or other liability guaranteed thereby.

"Controlled Group" means all members of a controlled group of corporations and all members of a controlled group of trades or businesses (whether or not incorporated) under common control which, together with the Borrower, are treated as a single employer under Section 414(b) or 414(c) of the Code or Section 4001 of ERISA.

"Default" means any Event of Default or any condition, occurrence or event which, after notice or lapse of time or both, would constitute an Event of Default.

"Disclosure Schedule" means the Disclosure Schedule attached hereto as Schedule 1, as it may be amended, supplemented, amended and restated or otherwise modified from time to time by the Borrower with the written consent of the Lender.

"Disposition" (or similar words such as "Dispose") means any sale, transfer, lease, contribution or other conveyance (including by way of merger) of, or the granting of options, warrants or other rights to, any of the Borrower's assets to any other Person in a single transaction or series of related transactions.

"Dollar" and the sign "$" mean lawful money of the United States.

"Effective Date" means the date this Agreement becomes effective pursuant to Section 9.10.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto of similar import, together with the regulations thereunder, in each case as in effect from time to time. References to Sections of ERISA also refer to any successor Sections thereto.

"Event of Default" is defined in Section 8.1.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal for each day during such period to

(a)  the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York; or

(b)  if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Lender from three federal funds brokers of recognized standing selected by it.

"Fiscal Quarter" means a quarter ending on the last day of March, June, September or December.

"Fiscal Year" means any period of twelve consecutive calendar months ending on December 31; references to a Fiscal Year with a number corresponding to any calendar year (e.g., the "2004 Fiscal Year") refer to the Fiscal Year ending on December 31 of such calendar year.

"F.R.S. Board" means the Board of Governors of the Federal Reserve System or any successor thereto.

"GAAP" is defined in Section 1.4.

"Governmental Authority" means the government of the United States, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other Person exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Hedging Obligations" means, with respect to any Person, all liabilities of such Person under currency exchange agreements, interest rate swap agreements, interest rate cap agreements and interest rate collar agreements, and all other agreements or arrangements designed to protect such Person against fluctuations in interest rates or currency exchange rates.

"herein", "hereof", "hereto", "hereunder" and similar terms contained in any Loan Document refer to such Loan Document as a whole and not to any particular Section, paragraph or provision of such Loan Document.

"Impermissible Qualification" means any qualification or exception to the opinion or certification of any independent public accountant as to any financial statement of the Borrower

(a)  which is of a "going concern" or similar nature;

(b)  which relates to the limited scope of examination of matters relevant to such financial statement; or

(c)  which relates to the treatment or classification of any item in such financial statement and which, as a condition to its removal, would require an adjustment to such item the effect of which would be to cause the Borrower to be in Default.

"<u>including</u>" and "<u>include</u>" means including without limiting the generality of any description preceding such term, and, for purposes of each Loan Document, the parties hereto agree that the rule of ejusdem generis shall not be applicable to limit a general statement, which is followed by or referable to an enumeration of specific matters, to matters similar to the matters specifically mentioned.

"<u>Indebtedness</u>" of any Person means, without duplication:

(a) all obligations of such Person for borrowed money or advances and all obligations of such Person evidenced by bonds, debentures, notes or similar instruments;

(b) all obligations, contingent or otherwise, relative to the face amount of all letters of credit, whether or not drawn, and banker's acceptances issued for the account of such Person;

(c) all Capitalized Lease Liabilities of such Person;

(d) for purposes of <u>Section 8.1.5</u> only, all other items which, in accordance with GAAP, would be included as liabilities on the balance sheet of such Person as of the date at which Indebtedness is to be determined;

(e) net Hedging Obligations of such Person, as determined in accordance with GAAP;

(f) whether or not so included as liabilities in accordance with GAAP, all obligations of such Person to pay the deferred purchase price of property or services excluding trade accounts payable in the ordinary course of business which are not overdue for a period of more than 90 days or, if overdue for more than 90 days, as to which a dispute exists and adequate reserves in conformity with GAAP have been established on the books of such Person, and indebtedness secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien on property owned or being acquired by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(g) obligations arising under Synthetic Leases; and

(h) all Contingent Liabilities of such Person in respect of any of the foregoing.

The Indebtedness of any Person shall include the Indebtedness of any other Person (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such Person, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"<u>Indemnified Liabilities</u>" is defined in <u>Section 9.5</u>.

"<u>Indemnified Parties</u>" is defined in <u>Section 9.5</u>.

"Interest Accrual Period" means a period beginning on the first Business Day of a month (or, in the case of the month in which the Loan is made, on the Closing Date for the Loan) and ending on the first Business Day of the next succeeding month (or, if earlier, on the Stated Maturity Date).

"Investment" means, relative to any Person,

(a) any loan, advance or extension of credit made by such Person to any other Person, including the purchase by such Person of any bonds, notes, debentures or other debt securities of any other Person;

(b) Contingent Liabilities in favor of any other Person; and

(c) any Capital Securities held by such Person in any other Person.

The amount of any Investment shall be the original principal or capital amount thereof less all returns of principal or equity thereon and shall, if made by the transfer or exchange of property other than cash, be deemed to have been made in an original principal or capital amount equal to the fair market value of such property at the time of such Investment.

"Lender" is defined in the preamble.

"LIBO Rate" means, relative to the Loan, the rate of interest equal to the rate appearing on Page BBAM of the Bloomberg Service for 1-month Libor (or on any successor or substitute page of such service reasonably satisfactory to the Lender and the Borrower) at approximately 11:00a.m., New York city time on any date of determination.

"Lien" means any security interest, mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or otherwise), charge against or interest in property, or other priority or preferential arrangement of any kind or nature whatsoever, to secure payment of a debt or performance of an obligation.

"Loan" is defined in Section 2.1.

"Loan Documents" means, collectively, this Agreement, the Note, any Borrowing Request, the Pledge Agreement and each other agreement, certificate, document or instrument delivered in connection with any Loan Document, whether or not specifically mentioned herein or therein.

"Material Adverse Effect" means a material adverse effect on (a) the business, financial condition, operations, performance or properties of any of (i) the Borrower or (ii) PlusFunds and its Subsidiaries taken as a whole, (b) the rights and remedies of the Lender under any Loan Document or (c) the ability of the Borrower to perform its Obligations under any Loan Document.

"Non-Excluded Taxes" means any Taxes other than net income and franchise Taxes imposed with respect to the Lender by any Governmental Authority (or any subdivision thereof or therein) under the laws of the jurisdiction in which the Lender is organized, in which it is

doing business (other than solely by reason of this Agreement) or in which it maintains its applicable lending office.

"Note" means a promissory note of the Borrower payable to the Lender, in the form of Exhibit A hereto (as such promissory note may be amended, endorsed or otherwise modified from time to time), evidencing the aggregate Indebtedness of the Borrower to the Lender resulting from the outstanding Loan, and also means all other promissory notes accepted from time to time in substitution therefor or renewal thereof.

"Obligations" means all obligations (monetary or otherwise, whether absolute or contingent, matured or unmatured) of the Borrower arising under or in connection with a Loan Document, including the principal of and premium, if any, and interest (including interest accruing during the pendency of any proceeding of the type described in Section 8.1.9, whether or not allowed in such proceeding) on the Loan.

"Organic Document" means, relative to the Borrower or PlusFunds , its certificate of incorporation, by-laws, certificate of partnership, partnership agreement, certificate of formation, limited liability agreement, operating agreement and all shareholder agreements, voting trusts and similar arrangements applicable to any of the Borrower's or PlusFunds' limited liability company interests or authorized shares of Capital Securities.

"Original Borrower" means Suffolk LLC, a Delaware limited liability company.

"Original Credit Agreement" means the Phase 1 Credit Agreement between the Original Borrower and the Lender dated March 29, 2005.

"Original Credit Agreement Obligations" means the "Obligations" as defined in the Original Credit Agreement.

"Original Loan Documents" means the Original Credit Agreement and the other "Loan Documents" as defined in the Original Credit Agreement.

"Original Stated Maturity Date" is defined in the definition of "Stated Maturity Date."

"Other Taxes" means any and all stamp, documentary or similar Taxes, or any other excise or property Taxes or similar levies that arise on account of any payment made or required to be made under any Loan Document or from the execution, delivery, registration, recording or enforcement of any Loan Document.

"Pension Plan" means a "pension plan", as such term is defined in Section 3(2) of ERISA, which is subject to Title IV of ERISA (other than a multiemployer plan as defined in Section 4001(a)(3) of ERISA), and to which the Borrower or any corporation, trade or business that is, along with the Borrower, a member of a Controlled Group, may have liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

"Person" means any natural person, corporation, limited liability company, partnership, joint venture, association, trust or unincorporated organization, Governmental Authority or any other legal entity, whether acting in an individual, fiduciary or other capacity.

"Pledge Agreement" means the Pledge Agreement executed and delivered by the Pledging Member, substantially in the form of Exhibit D hereto, as amended, supplemented, amended and restated or otherwise modified from time to time.

"Pledging Member" is defined in the second recital.

"PlusFunds" means PlusFunds Group, Inc., a Delaware corporation.

"PlusFunds Credit Agreement" means a Credit Agreement between PlusFunds and the Lender in substantially the form of Exhibit F.

"PlusFunds Loan Documents" mean the PlusFunds Credit Agreement and all other "Loan Documents" as defined in the PlusFunds Credit Agreement.

"Related Borrowers" means Suffolk-MKK LLC and Suffolk-KAV LLC.

"Related Credit Agreements" means the Phase 2 Credit Agreement, dated as of the date hereof, between Suffolk-MKK LLC and the Lender and the Phase 2 Credit Agreement, dated as of the date hereof, between Suffolk-KAV LLC and the Lender.

"Related Loan Documents" mean the Related Credit Agreements and the other "Loan Documents" as defined in the Related Credit Agreements.

"Related Obligations" means the "Obligations" as defined in the Related Credit Agreements.

"Restricted Payment" means the declaration or payment of any dividend (other than dividends payable solely in Capital Securities of the Borrower) on, or the making of any payment or distribution on account of, or setting apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of any class of Capital Securities of the Borrower or any warrants or options to purchase any such Capital Securities, whether now or hereafter outstanding, or the making of any other distribution in respect thereof, either directly or indirectly, whether in cash or property, obligations of the Borrower or otherwise other than distributions the proceeds of which are utilized for (a) the payment of interest on the Loan or (b) the payment of principal of the Loan.

"S&P" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc.

"SEC" means the Securities and Exchange Commission.

"Solvent" means, with respect to any Person and its Subsidiaries on a particular date, that on such date (a) the fair value of the property of such Person and its Subsidiaries on a consolidated basis is greater than the total amount of liabilities, including contingent liabilities,

of such Person and its Subsidiaries on a consolidated basis, (b) the present fair salable value of the assets of such Person and its Subsidiaries on a consolidated basis is not less than the amount that will be required to pay the probable liability of such Person and its Subsidiaries on a consolidated basis on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it or its Subsidiaries will, incur debts or liabilities beyond the ability of such Person and its Subsidiaries to pay as such debts and liabilities mature, and (d) such Person and its Subsidiaries on a consolidated basis is not engaged in business or a transaction, and such Person and its Subsidiaries on a consolidated basis is not about to engage in business or transaction, for which the property of such Person and its Subsidiaries on a consolidated basis would constitute an unreasonably small capital. The amount of Contingent Liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, can reasonably be expected to become an actual or matured liability.

"SPhinX Funds" means the SPhinX family of investment funds.

"Stated Maturity Date" means the date which is 24 months (the "Original Stated Maturity Date") from the initial "Closing Date" as defined in the Original Credit Agreement; provided that such Stated Maturity Date shall be extended to a date 18 months after the Original Stated Maturity Date, if the Lender shall not exercise its rights under Section 8.4 of the Original Credit Agreement on or before said Original Stated Maturity Date.

"Subsidiary" means, with respect to any Person, any other Person of which more than 50% of the outstanding securities having the power to vote for the election of directors, managers or other voting members of the governing body of such other Person (irrespective of whether at the time Capital Securities of any other class or classes of such other Person shall or might have voting power upon the occurrence of any contingency) is at the time directly or indirectly owned or controlled by such Person, by such Person and one or more other Subsidiaries of such Person, or by one or more other Subsidiaries of such Person. Unless the context otherwise specifically requires, the term "Subsidiary" shall be a reference to a Subsidiary of the Borrower. Neither PlusFunds nor any SPhinX Fund shall be deemed to be a "Subsidiary" of the Borrower or of any of its Subsidiaries or Affiliates for any purpose hereunder.

"Synthetic Lease" means, as applied to any Person, any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) (a) that is not a capital lease in accordance with GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for federal income Tax purposes, other than any such lease under which that Person is the lessor.

"Taxes" means any and all income, stamp or other Taxes, duties, levies, imposts, charges, assessments, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, and all interest, penalties or similar liabilities with respect thereto.

"Termination Date" means the date on which all Obligations have been paid in full in cash, and the Commitment shall have terminated.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, that if, with respect to any financing statement or by reason of any provisions of law, the perfection or the effect of perfection or non-perfection of the security interests granted to the Lender pursuant to the applicable Loan Document is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than New York, then "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of each Loan Document and any financing statement relating to such perfection or effect of perfection or non-perfection.

"United States" or "U.S." means the United States of America, its fifty states and the District of Columbia.

"Welfare Plan" means a "welfare plan", as such term is defined in Section 3(1) of ERISA.

SECTION 1.2. Use of Defined Terms. Unless otherwise defined or the context otherwise requires, terms for which meanings are provided in this Agreement shall have such meanings when used in each other Loan Document and the Disclosure Schedule, and each notice and other communication delivered from time to time in connection with any Loan Document.

SECTION 1.3. Cross-References. Unless otherwise specified, references in a Loan Document to any Article or Section are references to such Article or Section of such Loan Document, and references in any Article, Section or definition to any clause are references to such clause of such Article, Section or definition.

SECTION 1.4. Accounting and Financial Determinations. Unless otherwise specified, all accounting terms used in each Loan Document shall be interpreted, and all accounting determinations and computations thereunder shall be made, in accordance with generally accepted accounting principles ("GAAP") consistently applied.

ARTICLE II
COMMITMENTS, BORROWING
PROCEDURES AND NOTES

SECTION 2.1. Commitments. Subject to the conditions hereof (including, without limitation, Article V), the Lender agrees that it will make a single loan to the Borrower, in an amount not to exceed the Commitment Amount on the Closing Date. No amounts paid or prepaid with respect to the Loan may be reborrowed.

SECTION 2.2. Register; Notes. (a) The Borrower hereby designates the Lender to serve as the Borrower's agent, solely for the purpose of this clause, to maintain a register (the "Register") on which the Lender will record the Lender's Commitment and the borrowing and each repayment in respect of the principal amount of the Loan and any transfer of the Commitment or the Loan. Failure to make any recordation, or any error in such recordation, shall not affect the Borrower's Obligations. No assignment or transfer of the Commitment or the Loan shall be effective unless such assignment or transfer shall have been recorded in the Register by the Lender as provided in this Section and the entries in the Register shall be conclusive, in the absence of manifest error, as to the holder of the Commitment and Loan.

(b)  The Loan shall be evidenced by a Note payable to the order of the Lender in a principal amount equal to the maximum Commitment Amount.  The Borrower hereby irrevocably authorizes the Lender to make (or cause to be made) appropriate notations on the grid attached to the Lender's Note (or on any continuation of such grid), which notations, if made, shall evidence, inter alia, the date and the outstanding principal amount of the Loan evidenced thereby.  Such notations shall, to the extent not inconsistent with notations made by the Lender in the Register, be conclusive and binding on the Borrower absent manifest error; provided, however, that the failure of the Lender to make any such notations shall not limit or otherwise affect any Obligations of the Borrower.

SECTION 2.3.  Borrowing Procedures.  By delivering a Borrowing Request to the Lender not less than one and not more than five Business Days prior to the proposed Closing Date specified therein the Borrower may request the Loan in an amount up to the amount of the Commitment Amount.  The Lender shall make such funds available to the Borrower by wire transfer to the accounts the Borrower shall have specified in its Borrowing Request on or before 12:00 noon, New York City Time.

## ARTICLE III
## REPAYMENTS, PREPAYMENTS AND INTEREST

SECTION 3.1.  Repayments and Prepayments.  Payments and prepayments of the Loan shall or may be made as set forth below.

(a)  From time to time on any Business Day, the Borrower may make a voluntary prepayment, in whole or in part, of the outstanding principal amount of the Loan including any accrued interest thereon that has been added to principal pursuant to Section 3.3; provided, however, that (i) all such voluntary prepayments shall require at least one but no more than five Business Days' prior notice to the Lender; and (ii) all such voluntary partial prepayments shall be in an aggregate minimum amount of $500,000 and an integral multiple of $500,000; and

(b)  On the Stated Maturity Date, the Borrower shall make repayment of the entire aggregate outstanding principal amount of the Loan; and

(c)  Immediately upon any acceleration of the Stated Maturity Date of the Loan pursuant to Section 8.2 or Section 8.3, the Borrower shall repay the Loan in full.

Upon any prepayment in full or payment in full of the Obligations, the Related Obligations and the Original Credit Agreement Obligations, the Lender shall release the Collateral to the Borrower, subject, however, to the Lender's rights under the Pledge Agreement.

SECTION 3.2.  Interest Provisions.  Interest on the outstanding principal amount of the Loan shall accrue and be payable in accordance with the terms set forth below.

SECTION 3.3.  Interest Rates.  The Loan shall accrue interest at a rate per annum equal to the LIBO Rate plus the Applicable Margin.  The LIBO Rate applicable to the Loan shall be determined on the Closing Date for the Loan.  The LIBO Rate for the Loan shall be reset at the beginning of each Interest Accrual Period.  At the end of each Interest Accrual Period ending

9029181.5 29-Mar-05 10:03 04374457                         -12-

prior to the Original Stated Maturity Date (or at the Original Stated Maturity Date), all interest accrued on the Loan since the beginning of such Interest Accrual Period shall be added to the principal of the Loan and shall thereafter bear interest. All interest accruing after the Original Stated Maturity Date shall be payable in cash as provided in Section 3.5. In the event that the LIBO Rate is not available at any time for any reason, then the reference to the LIBO Rate in the foregoing sentences shall be substituted with a reference to the Federal Funds Rate, and the Loan shall accrue interest at a rate per annum equal to the Federal Funds Rate plus the Applicable Margin.

SECTION 3.4.   Post-Maturity Rates.   After the date any principal amount of the Loan is due and payable (whether on the Stated Maturity Date or upon acceleration), or after any other monetary Obligation of the Borrower shall have become due and payable, the Borrower shall pay, but only to the extent permitted by law, interest (after as well as before judgment) on such amounts at a rate per annum equal to the rate of interest that otherwise would be applicable to the Loan pursuant to Section 3.3 plus 2% per annum. All interest under this Section 3.4 shall be payable in cash.

SECTION 3.5.   Interest Payment Dates.   Interest accrued on the Loan shall be payable, without duplication and treating any accrued interest that has been added to principal pursuant to Section 3.3 as principal for this purpose:

(a)  on the Stated Maturity Date;

(b)  on the date of any payment or prepayment, in whole or in part, on the principal amount so paid or prepaid;

(c)  if the maturity date of the Loan has been accelerated pursuant to Section 8.2 or Section 8.3, immediately upon such acceleration; and

(d)  after the Original Stated Maturity Date, quarterly in arrears on the last Business Day of each calendar quarter.

Interest accrued on the Loan or other monetary Obligations after the date such amount is due and payable (whether on the Stated Maturity Date, upon acceleration or otherwise) shall be payable upon demand.

ARTICLE IV
CERTAIN TAX AND OTHER PROVISIONS

SECTION 4.1.   Taxes.   The Borrower covenants and agrees as follows with respect to Taxes.

(a)  Any and all payments by the Borrower under each Loan Document shall be made without setoff, counterclaim or other defense, and free and clear of, and without deduction or withholding for or on account of, any Non-Excluded Taxes. In the event that any Taxes are imposed and required to be deducted or withheld from any payment required to be made by the Borrower to or on behalf of the Lender under any Loan Document, then:

(i)  if such Taxes are Non-Excluded Taxes, the amount of such payment shall be increased as may be necessary such that such payment is made, after withholding or deduction for or on account of such Taxes, in an amount that is not less than the amount provided for in such Loan Document; and

(ii)  the Borrower shall withhold the full amount of such Taxes from such payment (as increased pursuant to clause (a) (i)) and shall pay such amount to the Governmental Authority imposing such Taxes in accordance with applicable law.

(b)  In addition, the Borrower shall pay any and all Other Taxes imposed to the relevant Governmental Authority imposing such Other Taxes in accordance with applicable law.

(c)  As promptly as practicable after the payment of any Taxes or Other Taxes, and in any event within 45 days of any such payment being due, the Borrower shall furnish to the Lender a copy of an official receipt (or a certified copy thereof or other evidence of payment reasonably acceptable to the Lender) evidencing the payment of such Taxes or Other Taxes.

(d)  The Borrower shall indemnify the Lender for any Non-Excluded Taxes and Other Taxes levied, imposed or assessed on (and whether or not paid directly by) the Lender (whether or not such Non-Excluded Taxes or Other Taxes are correctly or legally asserted by the relevant Governmental Authority).  Promptly upon having knowledge that any such Non-Excluded Taxes or Other Taxes have been levied, imposed or assessed, and promptly upon notice thereof from the Lender, the Borrower shall pay such Non-Excluded Taxes or Other Taxes directly to the relevant Governmental Authority (provided, however, that the Lender shall not be under any obligation to provide any such notice to the Borrower).  In addition, the Borrower shall indemnify the Lender for any incremental Taxes that may become payable by the Lender as a result of any failure of the Borrower to pay any Taxes when due to the appropriate Governmental Authority or to deliver to the Lender, pursuant to clause (c), documentation evidencing the payment of Taxes or Other Taxes.  With respect to indemnification for Non-Excluded Taxes and Other Taxes actually paid by the Lender or the indemnification provided in the immediately preceding sentence, such indemnification shall be made within 30 days after the date the Lender makes written demand therefor.  The Borrower acknowledges that any payment made to the Lender or to any Governmental Authority in respect of the indemnification obligations of the Borrower provided in this clause shall constitute a payment in respect of which the provisions of clause (a) and this clause shall apply.  The Lender shall provide any documentation reasonably requested by the Borrower to establish the legal entitlement of such Lender to an exemption from withholding with respect to payments under this Agreement.  The Borrower shall have no obligation to indemnify if such documentation is not provided, unless such Lender is reasonably unable to provide such documentation.  If the Lender receives a refund in respect of any Taxes with respect to which the Borrower has paid additional amounts pursuant to this Section 4.1, it shall promptly following the date of such receipt pay over the amount of such refund to the Borrower, net of all reasonable out-of-pocket expenses of the Lender and without interest (other than interest paid by the relevant taxation authority with

respect to such refund); provided that the Borrower, upon the request of the Lender, agrees to repay the amount paid over to the Borrower (plus penalties, interest or other reasonable charges) to the Lender in the event the Lender is required to repay such refund to such taxation authority.

SECTION 4.2. Payments, Computations, etc. All payments shall be made without setoff, deduction or counterclaim not later than 11:00 a.m. on the date due in same day or immediately available funds to such account as the Lender shall specify from time to time by notice to the Borrower. Funds received after that time shall be deemed to have been received by the Lender on the next succeeding Business Day. All interest and fees shall be computed on the basis of the actual number of days (including the first day but excluding the last day) occurring during the period for which such interest or fee is payable over a year comprised of 360 days. Payments due on other than a Business Day shall be made on the next succeeding Business Day and such extension of time shall be included in computing interest and fees in connection with that payment.

SECTION 4.3. Setoff. The Lender shall, upon the occurrence and during the continuance of any Default described in clauses (a) through (d) of Section 8.1.9 or upon the occurrence and during the continuance of any other Event of Default, have the right to appropriate and apply to the payment of the Obligations owing to it (whether or not then due), and (as security for such Obligations) the Borrower hereby grants to the Lender a continuing security interest in, any and all balances, credits, deposits, accounts or moneys of the Borrower then or thereafter maintained with the Lender. The Lender agrees promptly to notify the Borrower after any such setoff and application; provided, however, that the failure to give such notice shall not affect the validity of such setoff and application. The rights of the Lender under this Section are in addition to other rights and remedies (including other rights of setoff under applicable law or otherwise) which the Lender may have.

ARTICLE V
CONDITIONS

SECTION 5.1. Conditions to Loan. The obligations of the Lender to fund the Loan shall be subject to the prior or concurrent satisfaction or waiver of each of the conditions precedent set forth in this Section 5.1.

SECTION 5.1.1 Resolutions, etc. The Lender shall have received from the Borrower (i) a copy of a good standing certificate, dated a date reasonably close to the Closing Date for the Borrower, and (ii) a certificate, dated the Closing Date of the Loan, duly executed and delivered by the Borrower's Secretary or Assistant Secretary, managing member or general partner, as applicable, as to

(a) resolutions of the Borrower's sole member then in full force and effect authorizing (i) the execution, delivery and performance of each Loan Document to be executed by the Borrower and (ii) the transactions contemplated hereby and thereby;

(b) the incumbency and signatures of those of its managing member authorized to act with respect to each Loan Document to be executed by the Borrower; and

(c) the full force and validity of each Organic Document of the Borrower and copies thereof;

upon which certificates the Lender may conclusively rely until it shall have received a further certificate of the Secretary, Assistant Secretary, managing member or general partner, as applicable, of the Borrower canceling or amending such prior certificate.

SECTION 5.1.2 Borrower Closing Date Certificate. The Lender shall have received the Borrower Closing Date Certificate, dated the Closing Date, and duly executed and delivered by an Authorized Officer of the Borrower, in which certificate the Borrower shall agree and acknowledge that the statements made therein shall be true and correct representations and warranties of the Borrower as of the Closing Date. All documents and agreements required to be appended to the Borrower Closing Date Certificate shall be in form and substance satisfactory to the Lender.

SECTION 5.1.3 Contribution Agreement. The Pledging Member shall have delivered a duly executed contribution agreement in substantially the form of Exhibit G.

SECTION 5.1.4 Pledge Agreements.

(a) The Lender shall have received a counterpart of the Pledge Agreement, dated as of the date hereof, duly executed by the Pledging Member, pledging all of the issued and outstanding Capital Securities of PlusFunds owned by the Pledging Member from time to time together with such duly executed UCC financing statements as are necessary to perfect the Lender's security interest therein under the UCC.

(b) The Lender and its counsel shall be satisfied that (i) the Lien granted to the Lender in the Collateral described above will be a first priority (or local equivalent thereof) security interest; and (ii) no Lien will exist on the date of delivery of any of the Collateral described above other than the Lien created in favor of the Lender pursuant to the Pledge Agreement.

SECTION 5.1.5 INTENTIONALLY LEFT BLANK.

SECTION 5.1.6 Opinions of Counsel. The Lender shall have received an opinion, dated the Closing Date of the Loan and addressed to the Lender, from Gibson, Dunn & Crutcher LLP, New York counsel to the Borrower, in substantially the form attached hereto as Exhibit E.

SECTION 5.1.7 Satisfactory Legal Form. All documents executed or submitted pursuant hereto by or on behalf of the Borrower shall be reasonably satisfactory in form and substance to the Lender and its counsel; and the Lender and its counsel shall have received all information, approvals, opinions, documents or instruments as the Lender or its counsel may reasonably request.

SECTION 5.1.8 Prior or Simultaneous Closings. As a condition to the Loan, the Related Credit Agreements, the Related Loan Documents, the Original Credit Agreement and the Original Credit Documents, shall have been executed and delivered, or shall be simultaneously

executed and delivered, and all collateral to be delivered thereunder shall have been so delivered or shall be simultaneously delivered.

SECTION 5.1.9  Compliance with Warranties, No Default, etc.  Both before and after giving effect to the Loan:

(a)  the representations and warranties of the Borrower and the Pledging Member set forth in each Loan Document, shall, be true and correct in all material respects with the same effect as if then made (unless stated to relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date); and

(b)  no Default shall have then occurred and be continuing.

SECTION 5.1.10  Borrowing Request, etc.  The Lender shall have received a Borrowing Request for the Loan.  The delivery of a Borrowing Request and the acceptance by the Borrower of the proceeds of the Loan shall constitute a representation and warranty by the Borrower that on the date of the Loan (both immediately before and after giving effect to the Loan and the application of the proceeds thereof) the statements made in Section 5.1.9 are true and correct in all material respects.

SECTION 5.1.11  PlusFunds Credit Agreement.  As a condition to the Loan, the PlusFunds Credit Agreement and the PlusFunds Loan Documents shall have been executed and delivered by the borrower parties thereto.

SECTION 5.1.12  Corporate Action.  As a condition to the Loan, Amendment No. 1 to the Stockholders Agreement of PlusFunds (which shall be in the form attached hereto as Exhibit H) shall have been executed by PlusFunds, the Pledging Member and other shareholders of PlusFunds holding sufficient shares to approve such Amendment.

SECTION 5.1.13  Delivery of Collateral.  On the Closing Date the Pledging Member shall have delivered (or caused to be delivered) to the Lender certificates satisfactory to the Lender evidencing outstanding Capital Securities of PlusFunds owned by the Pledging Member as described in Section 6.13 of the Disclosure Schedule, which certificates shall be accompanied by undated instruments of transfer duly executed in blank.  The Pledging Member shall have paid all documentary taxes required in Ireland with respect to the Pledge Agreement.

ARTICLE VI
REPRESENTATIONS AND WARRANTIES

In order to induce the Lender to enter into this Agreement and to make the Loan hereunder, the Borrower represents and warrants to the Lender as set forth in this Article.

SECTION 6.1.  Organization, etc.  Each of the Borrower and PlusFunds is validly organized and existing and in good standing under the laws of the state or jurisdiction of its incorporation or organization, is duly qualified to do business and is in good standing as a foreign entity in each jurisdiction where the nature of its business requires such qualification, and has full power and authority and holds all requisite governmental licenses, permits and other

approvals to enter into and perform its Obligations under each Loan Document to which it is a party and to own and hold under lease its property and to conduct its business substantially as currently conducted by it. The Borrower has delivered to Lender copies of the Organic Documents of Borrower and PlusFunds, as currently in effect.

SECTION 6.2. <u>Due Authorization, Non-Contravention, etc</u>. The execution, delivery and performance by the Borrower of each Loan Document executed or to be executed by it, are in each case within the Borrower's powers, have been duly authorized by all necessary action, and do not

(a) contravene any (i) of the Borrower's Organic Documents, (ii) court decree or order binding on or affecting the Borrower or (iii) law or governmental regulation binding on or affecting the Borrower; or

(b) result in, or require the creation or imposition of, any Lien on the Borrower's properties (except as permitted by this Agreement) or

(c) result in a default under any contractual restriction binding on or affecting the Borrower.

SECTION 6.3. <u>Government Approval, Regulation, etc</u>. No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or other Person (other than those that have been, or on the Effective Date will be, duly obtained or made and which are, or on the Effective Date will be, in full force and effect) is required for the due execution, delivery or performance by the Borrower of any Loan Document to which it is a party. Neither the Borrower nor PlusFunds is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

SECTION 6.4. <u>Validity, etc</u>. Each Loan Document to which the Borrower is a party constitutes the legal, valid and binding obligations of the Borrower, enforceable against the Borrower, in accordance with its terms (except, in any case, as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally and by principles of equity).

SECTION 6.5. <u>Financial Information</u>. As of the date hereof and at all times prior to the Loan, the Borrower shall have no assets or liabilities.

SECTION 6.6. <u>No Material Adverse Change; Solvency</u>. As of the Closing Date, there has been no event since December 31, 2004 that would reasonably be expected to have a Material Adverse Effect (it being agreed that the changes in <u>Section 6.6</u> of the Disclosure Schedule hereto do not, individually or in the aggregate, have a Material Adverse Effect). The Borrower, both before and after giving effect to the making of the Loan, is Solvent.

SECTION 6.7. <u>Litigation, Labor Controversies, etc</u>. As of the Closing Date, there is no pending or, to the knowledge of the Borrower, threatened litigation, action, proceeding or labor controversy

(a) affecting the Borrower, or any of its properties, businesses, assets or revenues, which could reasonably be expected to have a Material Adverse Effect; or

(b) which purports to affect the legality, validity or enforceability of any Loan Document.

SECTION 6.8.  Subsidiaries.  The Borrower has no Subsidiaries and will have no Subsidiaries.

SECTION 6.9.  Ownership of Properties.  As of the Closing Date, the Borrower owns, (i) in the case of owned personal property, good and valid title to all of its properties and assets, tangible and intangible, of any nature whatsoever, free and clear of all Liens or claims, except for Liens permitted pursuant to Section 7.2.3 and (ii) in the case of leased personal property, valid and enforceable leasehold interests free and clear of all Liens or claims, except Liens permitted pursuant to Section 7.2.3.  The Borrower does not own or lease any real property.

SECTION 6.10.  Taxes.  As of the Closing Date, each of the Borrower and, to the best of Borrower's knowledge, PlusFunds has filed all tax returns and reports required by law to have been filed by it and has paid all Taxes thereby shown to be due and owing, except any such Taxes or charges which are being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books.

SECTION 6.11.  Pension Plans.  Neither the Borrower nor any member of its Controlled Group maintains any Pension Plans (other than defined contribution plans (as defined in Section 3(34) of ERISA)) or has any liability with respect to any Pension Plan other than the obligation to make employee and employer contributions pursuant to the terms of such defined contribution plans.

SECTION 6.12.  Regulations U and X.  The Borrower is not is engaged in the business of extending credit for the purpose of buying or carrying margin stock, and no proceeds of the Loan will be used to purchase or carry margin stock or otherwise for a purpose which violates, or would be inconsistent with, F.R.S. Board Regulation U or Regulation X.  Terms for which meanings are provided in F.R.S. Board Regulation U or Regulation X or any regulations substituted therefor, as from time to time in effect, are used in this Section with such meanings.

SECTION 6.13.  Capitalization of PlusFunds.  The entire authorized capital stock of PlusFunds consists of two classes of shares designated as preferred stock and common stock. The total number of shares PlusFunds is authorized to issue consists of (A) 467,000 shares of preferred stock, $.0001 par value per share, consisting of (i) 260,000 shares of Series A Junior Convertible Preferred Stock and (ii) 207,000 shares of Series B Senior Convertible Preferred Stock, of which 80,000 shares are designated as "Series B-1 Senior Convertible Preferred Stock" and 80,000 shares are designated as "Series B-2 Convertible Preferred Stock" and (B) 740,000 shares of common stock, $.0001 par value per share, consisting of 118,000 shares designated as Series E Common Stock, and 622,000 shares designated as "Common Stock".  Of such authorized shares, (A) 80,000 shares of Series B-1 Senior Convertible Preferred Stock are outstanding, (B) 80,000 shares of Series B-2 Senior Convertible Stock are outstanding,(C)

9029181.5 29-Mar-05 10:03 04374457                    –19–

47,000 shares of undesignated Series B Senior Convertible Preferred Stock are outstanding, (D) 252,939.99 shares of Series A Junior Convertible Preferred Stock are outstanding, (E) 67,205.76 shares of Series E Common Stock are outstanding, and (F) 103,169.84 shares of Common Stock are outstanding. PlusFunds has warrants and options outstanding to purchase 29,411.76 shares of Series E common stock and 18,154.18 shares of Common Stock. All of the outstanding shares of PlusFunds' capital stock are validly issued, fully paid and nonassessable, and are held of record by the respective holders set forth on <u>Section 6.13</u> of the Disclosure Schedule. Each of the issued warrants and options is held of record by the respective holders set forth on <u>Section 6.13</u> of the Disclosure Schedule. No shares were issued in violation of the preemptive rights of any shareholder. There are no other outstanding rights, options, warrants, preemptive rights, rights of first refusal or similar rights for the purchase or acquisition from PlusFunds of any Capital Securities of PlusFunds nor are there any commitments to issue or execute any such rights, options, warrants, preemptive rights or rights of first refusal. All outstanding securities of PlusFunds have been issued in full compliance with all applicable state and federal securities laws.

SECTION 6.14. <u>Capitalization of Borrower</u>. The Pledging Member owns 100% of the issued and outstanding membership interests of Borrower. There are no other outstanding rights, options, warrants, preemptive rights, rights of first refusal or similar rights for the purchase or acquisition of any membership interests of Borrower nor are there any commitments to issue or execute any such rights, options, warrants, preemptive rights or rights of first refusal. All outstanding membership interests of Borrower have been issued in full compliance with all applicable state and federal securities laws.

SECTION 6.15. <u>Board Representation of PlusFunds</u>. The Board of Directors of PlusFunds consists of up to 8 members, of which the Original Borrower and its Affiliates and MKK Limited, Mark Kavanagh and Chris Sugrue have the ability to appoint at least 5, whether by contract, ownership of voting securities, or otherwise. As of the Closing Date, the Original Borrower and its Affiliates and MKK Limited, Mark Kavanagh and Chris Sugrue have appointed 3 members of the current Board of Directors which consists of 5 members.

ARTICLE VII<br>COVENANTS

SECTION 7.1. <u>Affirmative Covenants</u>. The Borrower agrees with the Lender that until the Termination Date has occurred, the Borrower will perform the obligations set forth below.

SECTION 7.1.1 <u>Financial Information, Reports, Notices, etc.</u> The Borrower will furnish to the Lender copies of the following reports, notices and information:

(a) Within 45 days after each Fiscal Quarter, a Compliance Certificate, executed by the chief financial or accounting Authorized Officer of the Borrower, stating that no Default has occurred and is continuing (or, if a Default has occurred, specifying the details of such Default and the action that the Borrower has taken or proposes to take with respect thereto);

(b)  as soon as possible and in any event within three days after the Borrower obtains knowledge of the occurrence of a Default, a statement of an Authorized Officer of the Borrower setting forth details of such Default and the action which the Borrower has taken and proposes to take with respect thereto;

(c)  as soon as possible and in any event within three days after the Borrower obtains knowledge of (i) the occurrence of any material adverse development with respect to any litigation, action, proceeding or labor controversy or (ii) the commencement of any litigation, action, proceeding or labor controversy of the type and materiality described in Section 6.7, notice thereof and, to the extent the Lender requests, copies of all documentation relating thereto;

(d)  promptly after the sending or filing thereof, copies of all reports, notices, prospectuses and registration statements which the Borrower files with the SEC or any national securities exchange; and

(e)  such other financial and other information as the Lender may from time to time reasonably request (including information and reports in such detail as the Lender may request with respect to the terms of and information provided pursuant to the Compliance Certificate).

SECTION 7.1.2  Maintenance of Existence; Compliance with Laws, etc.  The Borrower will preserve and maintain its legal existence, and comply in all material respects with all applicable laws, rules, regulations and orders, including the payment (before the same become delinquent), of all Taxes, imposed upon the Borrower or upon its property except to the extent being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP have been set aside on the books of the Borrower.

SECTION 7.1.3  Maintenance of Properties.  The Borrower will maintain, preserve, protect and keep its properties in good repair, working order and condition (ordinary wear and tear excepted), and make necessary repairs, renewals and replacements so that the business carried on by the Borrower may be properly conducted at all times, unless the Borrower determines in good faith that the continued maintenance of such property is no longer economically desirable.

SECTION 7.1.4  Insurance.  The Borrower will maintain such insurance in such amounts as is customarily maintained by similarly situated companies.

SECTION 7.1.5  Books and Records.  The Borrower will keep books and records in accordance with GAAP which accurately reflect all of its business affairs and transactions and permit the Lender or any of its representatives, at reasonable times and intervals upon reasonable notice to the Borrower, to visit the Borrower's offices, to discuss the Borrower's financial matters with its officers and employees.

SECTION 7.1.6  Use of Proceeds.  The Borrower will apply the proceeds of the Loan for any lawful purpose, including the making of dividends or distributions in the total amount of the Loan to the Pledging Member.

SECTION 7.1.7 <u>Further Assurances</u>. The Borrower will promptly notify the Lender if the Borrower shall obtain ownership of any Capital Securities of PlusFunds and shall take such action as the Lender may request to cause the Lender to have a first priority, perfected security interest in such Capital Securities.

SECTION 7.2. <u>Negative Covenants</u>. The Borrower covenants and agrees with the Lender that until the Termination Date has occurred, the Borrower will itself perform or cause to be performed, the obligations set forth below.

SECTION 7.2.1 <u>Business Activities</u>. The Borrower will not engage in any business activity other than its compliance with the obligations applicable to it under each Loan Document; provided, however, that the Borrower may lend money on a non-recourse basis to the Pledging Member or his or its Affiliates.

SECTION 7.2.2 <u>Indebtedness</u>. The Borrower will not, create, incur, assume or permit to exist any Indebtedness, other than Indebtedness in respect of the Obligations.

SECTION 7.2.3 <u>Liens</u>. The Borrower will not create, incur, assume or permit to exist any Lien upon any of its property (including Capital Securities of any Person), revenues or assets, whether now owned or hereafter acquired, except:

(a) Liens securing payment of the Obligations;

(b) judgment Liens in existence for less than 45 days after the entry thereof or with respect to which execution has been stayed or the payment of which is covered in full (subject to a customary deductible) by insurance maintained with responsible insurance companies and which do not otherwise result in an Event of Default under <u>Section 8.1.6</u>; and

(c) Liens for Taxes not at the time delinquent or thereafter payable without penalty or being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books.

SECTION 7.2.4 <u>Investments</u>. The Borrower will not purchase, make, incur, assume or permit to exist any Investment in any other Person, except investments by way of (a) purchases of Capital Securities by the Borrower in PlusFunds and (b) loans of the proceeds of the Loan to the Pledging Member on a non-recourse basis.

SECTION 7.2.5 <u>Issuance of Capital Securities</u>. The Borrower will not issue any Capital Securities (whether for value or otherwise) to any Person.

SECTION 7.2.6 <u>Consolidation, Merger, etc</u>. The Borrower will not liquidate or dissolve, consolidate with, or merge into or with, any other Person, or purchase or otherwise acquire all or substantially all of the assets of any Person (or any division thereof).

SECTION 7.2.7 <u>No Permitted Dispositions</u>. The Borrower will not Dispose of any of the Borrower's assets to any Person in one transaction or series of transactions.

SECTION 7.2.8  <u>Modification of Organic Documents, etc.</u>  Without the prior written consent of the Lender, the Borrower will not consent to any amendment, supplement, waiver or other modification of, or enter into any forbearance from exercising any rights with respect to the terms or provisions contained in, any of (a) its Organic Documents or (b) except as expressly contemplated by <u>Section 5.1.12</u>.

SECTION 7.2.9  <u>Subsidiaries</u>.  The Borrower will not have any Subsidiaries.

SECTION 7.2.10  <u>Restrictive Agreements, etc.</u>  The Borrower will not enter into any agreement prohibiting

(a)  the creation or assumption of any Lien upon its properties, revenues or assets, whether now owned or hereafter acquired; or

(b)  the amendment or other modification of any Loan Document;

<u>provided</u>, <u>however</u>, that the foregoing prohibitions shall not apply to restrictions contained in any Loan Document.

ARTICLE VIII

EVENTS OF DEFAULT

SECTION 8.1.  <u>Listing of Events of Default</u>.  Each of the following events or occurrences described in this Article shall constitute an "<u>Event of Default</u>".

SECTION 8.1.1  <u>Non-Payment of Obligations</u>.  The Borrower shall default in the payment or prepayment when due of

(a)  any principal of or interest on the Loan; or

(b)  any other monetary Obligation, and such default shall continue unremedied for a period of three days after such amount was due.

SECTION 8.1.2  <u>Breach of Warranty</u>.  Any representation or warranty of the Borrower or Pledging Member made or deemed to be made in any Loan Document (including any certificates delivered pursuant to <u>Article V</u>) is or shall be incorrect when made or deemed to have been made in any material respect.

SECTION 8.1.3  <u>Non-Performance of Certain Covenants and Obligations</u>.  The Borrower shall default in the due performance or observance of any of its obligations under <u>Section 7.1.1</u>, <u>Section 7.1.6</u> or <u>Section 7.2</u> (other than <u>Sections 7.2.1</u> and <u>7.2.8</u>) or the Pledging Member shall default in the due performance or observance of any of its obligations under the Pledge Agreement and such default shall continue beyond any applicable grace period in said Pledge Agreement or an event of default or default shall occur under the Pledge Agreement.

SECTION 8.1.4  <u>Non-Performance of Other Covenants and Obligations</u>.  The Borrower or the Pledging Member shall default in the due performance and observance of any other agreement contained in any Loan Document executed by it, and such default shall continue

unremedied for a period of 30 days after the earlier to occur of (i) notice thereof given to the Borrower by the Lender or (ii) the date on which the Borrower has knowledge of such default.

SECTION 8.1.5  Default on Other Indebtedness.  A default shall occur in the payment of any amount when due (subject to any applicable notice and cure period), whether by acceleration or otherwise, of any principal or stated amount of, or interest or fees on, any Indebtedness (other than Indebtedness described in Section 8.1.1) of the Borrower or the Pledging Member having a principal or stated amount, individually or in the aggregate, in excess of $2,500,000, or a default shall occur in the performance or observance of any obligation or condition with respect to such Indebtedness if the effect of such default is to accelerate the maturity of any such Indebtedness or such default shall continue unremedied for any applicable period of time sufficient to permit the holder or holders of such Indebtedness, or any trustee or agent for such holders, to cause or declare such Indebtedness to become due and payable or to require such Indebtedness to be prepaid, redeemed, purchased or defeased, or require an offer to purchase or defease such Indebtedness to be made, prior to its expressed maturity.

SECTION 8.1.6  Judgments.  Any judgment or order for the payment of money individually or in the aggregate in excess of $250,000, (exclusive of any amounts fully covered by insurance (less any applicable deductible) and as to which the insurer has acknowledged its responsibility to cover such judgment or order) shall be rendered against the Borrower or the Pledging Member and such judgment shall not have been vacated or discharged or stayed or bonded pending appeal within 30 days after the entry thereof or enforcement proceedings shall have been commenced by any creditor upon such judgment or order.

SECTION 8.1.7  Pension Plans.  Any of the following events shall occur with respect to any Pension Plan

(a)  the institution of any steps by the Borrower, any member of its Controlled Group or any other Person to terminate a Pension Plan if, as a result of such termination, the Borrower or any such member could be required to make a contribution to such Pension Plan, or could reasonably expect to incur a liability or obligation to such Pension Plan, in excess of $1,000,000; or

(b)  a contribution failure occurs with respect to any Pension Plan sufficient to give rise to a Lien under Section 302(f) of ERISA.

SECTION 8.1.8  Change in Control.  Any Change in Control shall occur.

SECTION 8.1.9  Bankruptcy, Insolvency, etc.  The Borrower, PlusFunds or the Pledging Member shall

(a)  become insolvent or generally fail to pay, or admit in writing its inability or unwillingness generally to pay, debts as they become due;

(b)  apply for, consent to, or acquiesce in the appointment of a trustee, receiver, sequestrator or other custodian for any substantial part of the property of any thereof, or make a general assignment for the benefit of creditors;

(c)  in the absence of such application, consent or acquiescence in or permit or suffer to exist the appointment of a trustee, receiver, sequestrator or other custodian for a substantial part of the property of any thereof, and such trustee, receiver, sequestrator or other custodian shall not be discharged within 60 days; provided, that the Borrower hereby expressly authorizes the Lender to appear in any court conducting any relevant proceeding during such 60-day period to preserve, protect and defend its rights under the Loan Documents;

(d)  permit or suffer to exist the commencement of any bankruptcy, reorganization, debt arrangement or other case or proceeding under any bankruptcy or insolvency law or any dissolution, winding up or liquidation proceeding, in respect thereof, and, if any such case or proceeding is not commenced by the Borrower or PlusFunds or the Pledging Member, such case or proceeding shall be consented to or acquiesced in by the Borrower, PlusFunds or the Pledging Member, as the case may be, or shall result in the entry of an order for relief or shall remain for 60 days undismissed; provided, that the Borrower hereby expressly authorizes the Lender to appear in any court conducting any such case or proceeding during such 60-day period to preserve, protect and defend its rights under the Loan Documents; or

(e)  take any action authorizing, or in furtherance of, any of the foregoing.

SECTION 8.1.10  Impairment of Security, etc.  Any Loan Document, or any Lien granted thereunder shall (except in accordance with its terms), in whole or in part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of the Borrower or the Pledging Member; the Borrower or the Pledging Member shall, directly or indirectly, contest in any manner such effectiveness, validity, binding nature or enforceability; or, except as permitted under any Loan Document, any Lien securing any Obligation shall, in whole or in part, cease to be a perfected first priority Lien.

SECTION 8.1.11  Termination of Contracts.  S&P shall terminate or materially and adversely modify its contract with PlusFunds or PlusFunds shall be terminated as the manager of one or more of the SPhinX Funds (other than ordinary course terminations).

SECTION 8.1.12  INTENTIONALLY OMITTED.

SECTION 8.1.13  Related Credit Agreement.  Any of the Related Loan Documents shall have terminated or any "Event of Default" as defined therein shall occur.

SECTION 8.1.14  Original Credit Agreement.  Any of the Original Loan Documents shall have terminated or any "Event of Default" as described therein shall occur.

SECTION 8.1.15  PlusFunds Capital Securities Transactions.  PlusFunds shall issue any new Capital Securities of PlusFunds (for value or otherwise) to any Person, other than (a) common stock issuable upon conversion of currently issued and outstanding Capital Securities of PlusFunds as set forth on Section 8.1.15 of the Disclosure Schedule, (b) Capital Securities issuable upon exercise of options for PlusFunds Capital Securities, (c) options (but not warrants) for PlusFunds Capital Securities, provided that, the strike price for such options is not less than the greater of (i) a price based on a valuation for PlusFunds of $250 million and (ii) an amount

9029181.5 29-Mar-05 10:03 04374457                    -25-

equal to 8.93% of Assets Under Management, in each case plus all available cash on hand at PlusFunds in excess of the amount of cash, if any, needed to make its current assets equal to 110% of the greater of (x) its current liabilities, and (y) required regulatory capital, if any, of PlusFunds, at the time of grant, plus an amount equal to the aggregate exercise price for all outstanding options at the time of the grant divided by the fully-diluted shares of common stock (on an as converted and exercised basis) of PlusFunds at the time of such grant.

SECTION 8.2.  Action if Bankruptcy.  If any Event of Default described in clauses (a) through (d) of Section 8.1.9 with respect to the Borrower shall occur, the Commitment (if not theretofore terminated) shall automatically terminate and the outstanding principal amount of Loan and all other Obligations shall automatically be and become immediately due and payable, without notice or demand to any Person.

SECTION 8.3.  Action if Other Event of Default.  If any Event of Default (other than any Event of Default described in clauses (a) through (d) of Section 8.1.9 with respect to the Borrower) shall occur for any reason, whether voluntary or involuntary, and be continuing, the Lender may by notice to the Borrower declare all or any portion of the outstanding principal amount of the Loan and other Obligations to be due and payable and/or the Commitment (if not theretofore terminated) to be terminated, whereupon the amount of the Loan and other Obligations which shall be so declared due and payable shall be and become immediately due and payable, without further notice, demand or presentment, and/or, as the case may be, the Commitment shall terminate.  The rights of the Lender under this Section 8.3 shall be subject to the Pledge Agreement.

ARTICLE IX
MISCELLANEOUS PROVISIONS

SECTION 9.1.  Waivers, Amendments, etc.  The provisions of each Loan Document may from time to time be amended, modified or waived, if such amendment, modification or waiver is in writing and consented to by the Borrower and the Lender.

SECTION 9.2.  No Deemed Waiver.  No failure or delay on the part of the Lender in exercising any power or right under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right.  No notice to or demand on the Borrower in any case shall entitle it to any notice or demand in similar or other circumstances. No waiver or approval by the Lender under any Loan Document shall, except as may be otherwise stated in such waiver or approval, be applicable to subsequent transactions.  No waiver or approval hereunder shall require any similar or dissimilar waiver or approval thereafter to be granted hereunder.

SECTION 9.3.  Notices; Time.  All notices and other communications provided under each Loan Document shall be in writing (including by facsimile) and addressed, delivered or transmitted, if to the Borrower, at its address or facsimile number set forth below its signature in this Agreement, and if to the Lender, at its address or facsimile number set forth below its signature in this Agreement, or at such other address or facsimile number as may be designated by such party in a notice to the other parties.  Any notice, if mailed and properly addressed with

9029181.5 29-Mar-05 10:03  04374457                          -26-

postage prepaid or if properly addressed and sent by pre-paid courier service, shall be deemed given when received; any notice, if transmitted by facsimile, shall be deemed given when the confirmation of transmission thereof is received by the transmitter. Electronic mail and Internet and intranet websites may be used only to distribute routine communications, such as financial statements and other information as provided in <u>Section 7.1.1</u>, and to distribute Loan Documents for execution by the parties thereto, and may not be used for any other purpose. The parties hereto agree that delivery of an executed counterpart of a signature page to this Agreement and each other Loan Document by facsimile shall be effective as delivery of an original executed counterpart of this Agreement or such other Loan Document. Unless otherwise indicated, all references to the time of a day in a Loan Document shall refer to New York time.

SECTION 9.4. <u>Payment of Costs and Expenses</u>. The Borrower agrees to reimburse the Lender upon demand for all reasonable out-of-pocket expenses (including reasonable attorneys' fees and legal expenses of counsel to the Lender) incurred by the Lender in connection with (x) the negotiation of any restructuring or "work-out" with the Borrower, whether or not consummated, of any Obligations and (y) the enforcement of any Obligations.

SECTION 9.5. <u>Indemnification</u>. In consideration of the execution and delivery of this Agreement by the Lender, the Borrower hereby indemnifies, exonerates and holds the Lender and each of its officers, directors, employees and agents (collectively, the "<u>Indemnified Parties</u>") free and harmless from and against any and all actions, causes of action, suits, losses, costs, liabilities and damages, and expenses incurred in connection therewith (irrespective of whether any such Indemnified Party is a party to the action for which indemnification hereunder is sought), including reasonable attorneys' fees and disbursements, whether incurred in connection with actions between or among the parties hereto or the parties hereto and third parties (collectively, the "<u>Indemnified Liabilities</u>"), incurred by the Indemnified Parties or any of them as a result of, or arising out of, or relating to

(a) any transaction financed or to be financed in whole or in part, directly or indirectly, with the proceeds of the Loan;

(b) any breach of representation, warranty or covenant of the Borrower or the Pledging Member hereunder or under any Loan Document;

(c) the entering into and performance of any Loan Document by any of the Indemnified Parties (including any action brought by or on behalf of the Borrower as the result of any determination by the Lender pursuant to <u>Article V</u> not to fund any Loan, provided that any such action is resolved in favor of such Indemnified Party); and

(d) any investigation, litigation or proceeding related to any acquisition or proposed acquisition by the Borrower thereof of all or any portion of the Capital Securities or assets of any Person, whether or not an Indemnified Party is party thereto;

except for Indemnified Liabilities arising for the account of a particular Indemnified Party by reason of the relevant Indemnified Party's gross negligence or willful misconduct.

SECTION 9.6. <u>Confidentiality</u>. (a) The Lender shall keep all Confidential Information confidential, and, in particular, shall exercise in relation to the Confidential Information no lesser

security measures and degree of care than those applied to the Lender's own confidential information. The Lender shall not use the Confidential Information for any purpose other than monitoring, managing and maintaining the Loan and preserving the Lender's rights and obligations under this Agreement. In no event shall the Lender use the Confidential Information for any commercial or competitive purpose unrelated to this Agreement.

(b) The Lender shall not disclose any Confidential Information to any third party, except (i) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to the Loan or the enforcement of rights hereunder; (ii) if such Confidential Information is requested by any regulatory authority with competent jurisdiction over the Lender; or (iii) to the extent disclosure is required by law, regulation or a court of competent jurisdiction; provided that the Lender shall give the Borrower prior written notice of such required disclosure.

(c) The Lender will maintain adequate internal controls and procedures to ensure that the Confidential Information will not come into the possession of persons who are engaged in or who could reasonably be expected in the near future to engage in commercial activities that could reasonably be foreseen to be in competition with the Borrower or Affiliates or the SPhinX Funds. The Lender will not permit any Person to have access to the Confidential Information except for the Lender's Treasurer, Controller and Chief Financial Officer, and the Lender will order such Persons to preserve the confidentiality of the Confidential Information to the same extent as the Lender is required to do so under this Agreement.

(d) Nothing in this Section 9.6 shall restrict the disclosure of Confidential Information by the Lender to its directors, officers, employees, affiliates, representatives (including, without limitation, financial advisors, attorneys and accountants) or agents (i) who need to know such Confidential Information for the sole purpose of monitoring, managing or maintaining the Loan and preserving the Lender's rights and obligations under this Agreement, (ii) who are informed of the confidential nature of the Confidential Information, (iii) who agree to keep the Confidential Information confidential and use the Confidential Information solely for said purposes and (iv) who are not involved in Lender's alternative investment activity (other than Phillip Bennett and other persons mutually agreed upon in writing by the Borrower and the Lender which agreement by the Borrower will not be unreasonably withheld).

(e) The obligations under this Section 9.6 will continue for a period ending six months after the earlier of (i) the Stated Maturity Date or (ii) the exercise by the Lender of its Call Right under the Pledge Agreement.

SECTION 9.7. Survival. The obligations of the Borrower under Sections 4.1, 4.2, 4.3, 9.4 and 9.5, and the obligations of the Lender under Sections 9.1 and 9.6, shall in each case survive the occurrence of the Termination Date. The representations and warranties made by the Borrower in each Loan Document shall survive the execution and delivery of such Loan Document and the occurrence of the Termination Date.

9029181.5 29-Mar-05 10:03  04374457

-28-

SECTION 9.8. <u>Severability</u>. Any provision of any Loan Document which is prohibited or unenforceable in any jurisdiction shall, as to such provision and such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of such Loan Document or affecting the validity or enforceability of such provision in any other jurisdiction.

SECTION 9.9. <u>Headings</u>. The various headings of each Loan Document are inserted for convenience only and shall not affect the meaning or interpretation of such Loan Document or any provisions thereof.

SECTION 9.10. <u>Execution in Counterparts, Effectiveness, etc</u>. This Agreement may be executed by the parties hereto in several counterparts, each of which shall be an original (whether such counterpart is originally executed or an electronic copy of an original and each party hereto expressly waives its rights to receive originally executed documents other than with respect to the Note) and all of which shall constitute together but one and the same agreement. This Agreement shall become effective (the "Effective Date") when counterparts hereof executed on behalf of the Borrower and the Lender shall have been received by the Lender.

SECTION 9.11. <u>Governing Law; Entire Agreement</u>. EACH LOAN DOCUMENT WILL EACH BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING FOR SUCH PURPOSE SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK). The Loan Documents constitute the entire understanding among the parties hereto with respect to the subject matter thereof and supersede any prior agreements, written or oral, with respect thereto.

SECTION 9.12. <u>Successors and Assigns</u>. (a) This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns; <u>provided, however</u>, that (i) the Borrower may not assign or transfer its rights or obligations hereunder without the consent of the Lender, and (ii) the Lender may not assign or otherwise transfer its rights or obligations hereunder except in accordance with subsection (b) below (and any attempted assignment or transfer by the Lender except in accordance with such subsection (b) shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any person (other than the parties hereto and their respective successors and assigns permitted hereby), any legal or equitable right, remedy or claim under or by reason of this Agreement;

(b) No interest in the Loan or under this Agreement shall be transferable, in whole or in part, except upon the written consent of the Borrower. The Borrower shall not be required to furnish (nor shall the Lender be permitted to furnish) any Confidential Information to a proposed transferee of the Loan, whether prior to any transfer of the Loan or at any time thereafter, unless and until such transferee has agreed to confidentiality obligations that are acceptable to the Borrower in its sole discretion, with respect to such Confidential Information. The Borrower may refuse to consent to a proposed transfer of the Loan or to provide information to a proposed transferee even if the proposed transferee agrees to the foregoing confidentiality obligations and such failure to provide Confidential Information shall not constitute an Event of Default.

(c) Notwithstanding anything herein to the contrary, if as a result of circumstances existing at the date of any transfer of any interest in the Loan, the Borrower would be obligated to make a payment to such transferee under Section 4.1 of this Agreement, then the transferee shall be entitled to receive payment under that Section only to the same extent as the Lender would have been if such transfer had not occurred.

SECTION 9.13.  Fiduciary Duties.  Notwithstanding anything herein to the contrary, nothing in this Agreement shall prohibit the representatives of the Borrower, the Pledging Member and their Affiliates serving on the Board of Directors of PlusFunds from exercising their fiduciary duties to PlusFunds.

SECTION 9.14.  Other Transactions.  Nothing contained herein shall preclude the Lender from engaging in any transaction, in addition to those contemplated by the Loan Documents, with the Borrower or any of its Affiliates in which the Borrower or such Affiliate is not restricted hereby from engaging with any other Person.

SECTION 9.15.  Forum Selection and Consent to Jurisdiction.  ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, ANY LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE LENDER OR THE BORROWER IN CONNECTION HEREWITH OR THEREWITH MAY BE BROUGHT AND MAINTAINED IN THE COURTS OF THE STATE OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK; PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT THE LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND.  THE BORROWER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY REGISTERED MAIL, POSTAGE PREPAID, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF NEW YORK AT THE ADDRESS FOR NOTICES SPECIFIED IN SECTION 9.3.  THE BORROWER HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  TO THE EXTENT THAT THE BORROWER HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, THE BORROWER HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THE LOAN DOCUMENTS.

SECTION 9.16.  Waiver of Jury Trial.  THE LENDER AND THE BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHTS THEY MAY HAVE TO A

9029181.5  29-Mar-05 10:03  04374457                    -30-

TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, EACH LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE LENDER OR THE BORROWER IN CONNECTION THEREWITH.  THE BORROWER ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION (AND EACH OTHER PROVISION OF EACH OTHER LOAN DOCUMENT TO WHICH IT IS A PARTY) AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE LENDER ENTERING INTO THE LOAN DOCUMENTS.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

SUFFOLK-SUG LLC

By: _____
Name:
Title: Christopher Sugrue

Address: 14 Wellington Road
4 Dublin Ireland
Attention: Christopher Sugrue
Facsimile No.: 011 353 16680 273

REFCO CAPITAL LLC

By: _____
Name:  Phillip Bennett
Title:   President

200 Liberty Street
New York, New York 10281-1057
Attention:  Phillip Bennett
Facsimile No.:  212-693-7686

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

SUFFOLK-SUG LLC

By:_____
    Name:
    Title:


    Address:
    Attention:
    Facsimile No.:


REFCO CAPITAL LLC

By:_____
    Name:  Phillip Bennett
    Title:   President


    200 Liberty Street
    New York, New York 10281-1057
    Attention:  Phillip Bennett
    Facsimile No.:  212-693-7686

9028034

*Phase 2 Credit Agreement*
*Suffolk-SUG LLC*

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Marc S. Kirschner, as the Trustee of the Refco Litigation Trust

## DEFENDANTS
Christopher Sugrue and John Does

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
**(EXCEPT IN U.S. PLAINTIFF CASES)**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM ADDRESS AND TELEPHONE NUMBER)
Gregory W. Werkheiser, Esquire
Morris, Nichols, Arsht & Tunnell LLP
1201 No. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT    (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R R & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers | Injury Product Liability | ☐ 650 Airline Regs | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | **PERSONAL PROPERTY** | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | ☒ 370 Other Fraud | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl Veterans) | ☐ 345 Marine Product | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | Exchange |
| ☐ 160 Stockholder Suits | ☐ 355 Motor Vehicle | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | | ☐ 730 Labor Mgmt. Reporting | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | & Disclosure Act | | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl Ret Inc | or Defendant | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **HABEAS CORPUS:** | Security Act | ☐ 871 IRS - Third Party | ☐ 895 Freedom of |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Information Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities- | ☐ 540 Mandamus & Other | | | Determination Under |
| | Employment | ☐ 550 Civil Rights | | | Equal Access to Justice |
| | ☐ 445 Amer. w/Disabilities- | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN    (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed From State Court
☐ 3 Remanded From Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred From another district (specify) _____
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statues unless diversity):

11 U.S.C. § 550

Brief description of cause:

Recovery of Fraudulent Transfers

## VII. REQUESTED IN COMPLAINT
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ YES   ☒ NO

## VIII. RELATED CASE(S) IF ANY
(See Instructions) *Kirschner v. Kavanagh, et al.* and *Kirschner v. MKK Limited, et al.* both filed contemporaneously with this action

JUDGE _____

DOCKET NUMBER _____

DATE
10/16/07

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JS 44 Reverse (Rev. 11/04)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44

## Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the Untied States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.    **(a) Plaintiffs – Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify the first agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE; In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.    **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III. **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C., Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

V.    **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV above, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

VI.    **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**    Example:    U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

VII.    **Requested in Complaint. Class Action.** Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.    **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _0 7 - 6 4 5_

# ACKNOWLEDGMENT
# OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____ COPIES OF AO FORM 85.

_10-16-07_

(Date forms issued)

(Signature of Party or their Representative)

_Aaron Johnston_

(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action